J. L. Davis *v*. State of Tennessee.

(*Jackson*, April Term, 1930.)

Opinion filed May 24, 1930.

24

ROUTT & MYERS, W. B. LAMB, JR., PITTS, McCONNICO & HATCHER and ALLISON, LYNCH & PHILLIPS, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for defendant in error.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The plaintiff in error was indicted for killing one L. R. Noe and convicted of murder in the second degree.

Noe was killed May 6, 1927, in the village of Flintville. He was a middle aged man, a respected citizen, and a member of the county court. The plaintiff in error was sixty-seven years of age at the time of the tragedy. He was a physician, having begun the practice of medicine in 1890 in Franklin County, where he remained for about fifteen years. He then removed to the West on account of the health of one of his children, he having married and raised a family. He remained in the West for about ten years and moved back to Tennessee, taking up

his abode at Lexie Cross Roads in Franklin County, Tennessee, where he stayed until the latter part of the year 1925. Meanwhile his first wife had died.

Late in 1925 or early in 1926 he moved from Lexie Cross Roads to Flintville, at the request of citizens of the latter place, they being without a physician in their neighborhood.

There was a lady in Flintville named Mrs. Goodwin who ran a drug store, she having succeeded to that business upon the death of her husband. She also owned a house, suitable for a doctor's office, and this house was rented from her by the plaintiff in error Dr. Davis. He and Mrs. Goodwin seemed to have been attracted to each other at once and they were married after he had been in Flintville two or three months, in February, 1926.

On the day of his marriage, or the day before, Dr. Davis went into Mrs. Goodwin's drug store. The deceased preceded the doctor into the store. When the doctor came in Mrs. Goodwin was apparently undertaking to hide some article which she had in her hands before either of the men entered and Noe was talking to her. It later appeared that Mrs. Goodwin had been working on a nightgown or some article of lingerie which she was endeavoring to conceal.

Upon this incident alone Dr. Davis conceived the idea that improper relations existed between Mrs. Goodwin and the deceased Noe. This idea appears not to have taken possession of him until after the marriage for the ceremony was duly consummated.

After the marriage Dr. Davis testifies that he could never enter into marital relations with his wife—that the image of Noe always came between them. Later he told his wife of his belief and she endeavored to reason with him about the matter and he evidently endeavored to rea-

son with himself and free his mind from the idea. He was unable, however to overcome his conviction that his wife had misbehaved herself with Noe.

Mrs. Davis testified and confirmed the statements of Dr. Davis in this particular. She said he was a good man, good to her and to her children, that she was fond of him, and tried to clear his mind of his derogatory belief as to her conduct, but that she was utterly unable to do so.

It should be stated in this connection that all the proof showed that Mrs. Davis was a woman whose character was above reproach. There was no justification for any suspicion as to her deportment.

She stated, and Dr. Davis agreed, that it was impossible for her to live with him while he entertained such ideas about her, and it was arranged between them they should separate, and that she should file a bill for divorce. Pursuant to this arrangement Dr. Davis went to Nashville for treatment for diabetes from which he was suffering, remained sometime, and his wife brought suit for divorce which was granted to her.

Dr. Davis and this lady whom he married never lived together as husband and wife. His conviction as to her relations with Noe always prevented this. It cannot be doubted on this record that Dr. Davis truly and absolutely believed that his wife had misbehaved herself. It is equally plain on the record that there was no basis whatever for this belief. It is also clear that the plaintiff in error entertained this belief as a settled conviction, that he entertained it at the time he killed Noe, and that he entertained it at the time of his trial. So much indeed is conceded by the State, and the jury so found, as will hereafter appear, and we accordingly have to deal with

the criminal responsibility of a man laboring under an insane delusion.

As above stated, Dr. Davis went to Nashville for medical treatment, when it was agreed between him and his wife that she should get a divorce. After leaving Nashville he moved back to Lexie Cross Roads, where he had resided before going to Flintville, and practiced medicine at the former place for some months. On May 5, 1927, he made a trip to Flintville to collect some bills owing him from persons there. He spent the night at a boarding house, putting his automobile in Copeland's garage. On the day of the 6th he was in and out of Copeland's garage several times, going about the community looking after his collections. On the afternoon of May 6, while he was seated in Copeland's garage, the deceased Noe, accompanied by another man, stopped at the garage to get gasoline and oil for his car. It does not appear that Noe knew that Dr. Davis was at the garage or that Dr. Davis anticipated any meeting with Noe.

While Noe's car was standing at the garage, Dr. Davis, who had been seated in the house, got up, walked out to the car and began to curse Noe with the utmost violence, applying to Noe the strongest epithets possible. Noe asked or undertook to ask what he had ever done to call forth such denunciation and Dr. Davis then opened fire on Noe with his pistol, shooting him several times, inflicting wounds from which Noe died shortly.

The shooting was witnessed by Copeland, the owner of the garage, and Young, the man who was riding with Noe. Both of them testified that Noe was seated in the car when the shooting began, making no demonstration whatever toward Dr. Davis, and all that Noe ever did was to try and get out of the car after the shooting began.

In his own testimony Dr. Davis states that Noe made a move as if to draw a weapon when he (Davis) began his denunciation. This, however, is in conflict with the testimony of Copeland and Young, and counsel for the plaintiff in error appear to place no credence upon this testimony of their client.

Dr. Davis testified at some length and it seems rather plain from his own evidence that the sight of Noe, the man Dr. Davis believed had debauched his late wife, so aroused him that he went out and cursed him and killed him without any overt act on the part of Noe at all.

Plaintiff in error said that when Noe stopped at the garage and saw him (Davis), there was an indescribably mean, or triumphant look in Noe's eyes; that he (Davis) thought of the wrong that Noe had done him and went out to denounce him and only intended to shoot in case Noe offered resentment, in which event Davis said he intended to shoot for his own protection.

Dr. Davis testified that he knew that it was wrong to assassinate a man, or to kill a man except in self-defense. After Noe was shot, Dr. Davis went back into the garage and took a seat and said that he did this because he knew an officer would be there for him in a little while—showing in this way that he realized perfectly that he had violated the law in killing Noe.

There is much proof in the record as to the details of the life of Dr. Davis. It is shown that he is a gentleman and a physician of good repute, well thought of and esteemed by all who know him. He has had much of affliction in his life, sickness and deaths in his family, and he himself having sustained many bodily afflictions. As heretofore noted, he seemed to have suffered with diabetes. He also had a paralytic stroke at one time and was terribly burned on another occasion by the explosion

of a lamp. His life was despaired of as the result of this accident, but he finally recovered. The burns caused by the explosion were so painful and his recovery so slow, it was necessary for him to take morphine for quite a time and he acquired the habit. At another time in his life, his health was such that he resorted to the use of morphine and acquired the habit. According to his testimony, he was able on both occasions by great effort to break himself of the drug. There is no other proof in the record except his own as to this.

The case was tried at length and submitted to the jury. After some deliberation, the jury returned to the courtroom and reported in substance that they found that the defendant below was insane on the subject of the relations between his late wife and Noe, but they further found that he knew the difference between right and wrong, and they asked the court what, under such circumstances, they should do.

In response, the court read to the jury a part of his charge previously given them and added some further instructions. The court rejected the contention that, if by reason of mental disease, the will power of the defendant below was so impaired, he was unable to resist the impulse to kill Noe, he would not be guilty, although he could distinguish between right and wrong as to the particular act.

The charge of the court was to the effect that although plaintiff in error acted under an irresistible impulse produced by an insane delusion he would still be guilty if he could distinguish between right and wrong and knew that it was wrong to kill Noe.

Counsel contend that there may be a mental disease destroying the faculty of volition, of choosing, as well as a mental disease destroying the faculty of perception,

and that either condition would relieve defendant of criminal accountability.

The court refused to recognize as a defense destroyed volition, even as a result of mental disease, apart from destroyed perception.

This difference between counsel for the defendant below and the trial judge is with respect to a matter upon which the courts of the country are divided. Irresistible impulse, coming from disease, not emotion, moral depravity, or criminal perversion, is regarded in many jurisdictions as a defense in criminal prosecutions. In other jurisdictions the idea is rejected.

The cases are collected and cited in 29 Corpus Juris, 1053. They are too numerous to justify a review, particularly in view of former decisions of this court.

It is insisted by counsel for the plaintiff in error that this court is not so far committed on the doctrine of irresistible impulse but we think that this is a mistake.

In *Wilcox* v. *State,* 94 Tenn., 106, it was said by the court that:

"The idea that an irresistible impulse is an excuse for the commission of crime, where the party is capable of knowing right from wrong, has no foundation in our jurisprudence."

It is true that further on in the opinion in this case the court takes up and apparently approves certain instructions of the trial judge in which he stated the law as to insane delusions and irresistible impulse very much as counsel for defendant below framed the concept to which we have just referred. It was probably in the mind of the writer of the opinion to indicate that the charge must be approved even from the standpoint of the defendant in that case rather than to indicate that the charge should be altogether approved as a correct statement of

the law. It may be conceded that on the whole *Wilcox* v. *State* leaves the matter in some confusion. The case, however, is usually understood and cited' by the textbooks as holding that irresistible impulse is not a defense apart from the right and wrong test.

In *Johnson* v. *State,* 100 Tenn., 254, the idea of an insane delusion apart from the right and wrong test appears to be definitely rejected as a defense and *Wilcox* v. *State, supra,* is cited for this conclusion. That was a prosecution for murder. The principal defense was that of justifiable homicide and there was no special proof offered as to the defendant's sanity. However, counsel for defendant below had evidently argued that defendant *belicved* himself in danger and a request was offered as follows:

"The actual existence of danger is not an essential ingredient but if from all the facts and circumstances as they are developed to you in this case you shall believe that the defendant was laboring under such a state of mind as what the law terms a delusion, whether such delusion be a result of insanity or of physical causes, (that) is a justification of violence adequate to remove the supposed danger; in other words if the belief that the taking of the life of another is the appropriate remedy for a minor or imaginary evil may be an insane delusion."

While this request is not as coherent as might be, and not strictly accurate in other respects, its denial was approved by this court, because the right and wrong test was not embodied. The court said:

"Moreover, the request submitted on the subject of insane delusions is not in accord with the standard prescribed by this Court for determining responsibility for criminal acts. Insanity, in order to excuse a party for crime, must be of such a character as to deprive the per-

son of his reason so far as to render him incapable of distinguishing between right and wrong, or of discerning good from evil. The capacity to know right from wrong, and to know that the particular act being committed is wrong, is the rule recognized in this State for testing criminal accountability.'' *Johnson* v. *State, supra.*

This is a definite holding that an insane delusion does not excuse from crime in Tennessee unless accompanied likewise by perceptional insanity. Irresistible impulse influenced by an insane delusion is therefore a defense not known to our law as long as the faculty remains to distinguish between right and wrong.

The general rule is that if a defendant has capacity and reason to enable him to distinguish the difference between right and wrong as to the particular act he is then doing, he is criminally responsible for such act. Some of our later cases are *McElroy* v. *State,* 146 Tenn., 442; *Watson* v. *State,* 133 Tenn., 198, and *Bond* v. *State,* 129 Tenn., 75.

While the court fully appreciates the force of the reasoning of the courts accepting the doctrine of irresistible impulse and the logic of the position from the standpoint of the psychiatrist, nevertheless there are many grave objections to this doctrine in its practical application and it has been heretofore rejected by this court. The majority of the court think it wise to adhere to the right and wrong test as announced in *Johnson* v. *State, supra.*

So while upon the facts of the case, the plaintiff in error, notwithstanding his delusion, cannot be acquitted of criminal accountability, we do not approve the conviction for murder in the second degree.

We are of opinion that if as a matter of fact the deceased had debauched the wife of plaintiff in error and the plaintiff in error had been apprised of that fact and

had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition while under the influence of passion and agitation produced by such information, had killed Noe, he would only have been guilty of voluntary manslaughter. *Toler* v. *State,* 152 Tenn., 1.

The right and wrong test above mentioned was authoritatively laid down in *McNaughten's case,* 1 C. & K., 130, 8 Eng. Reprint, 718. Under that case and those following it a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed, would have excused the defendant.

"Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act. Thompson's-Shannon's Code, sec. 6444.

Such being the law, it ensues that plaintiff in error would have been guilty of manslaughter only, if when he was first obsessed by this insane conceit, acting under the passion and agitation thereby produced, 'he had killed Esquire Noe.

In the case of a normal man who has been apprised of the violation of the chastity of a female member of his family, if sufficient time has elapsed between the receipt of the information and the homicide so that his passion has had time to cool, the killing of the seducer would be murder. *Toler* v. *State, supra.*

Cooling time affects the degree of a defendant's guilt under the law because during such an interval there is opportunity for the voice of reason, the voice of conscience, to be heard. If these voices are ignored, the kill-

ing will be attributed to deliberate revenge and punished as murder.

We have before us a man found by the jury to have been insane on the subject of his wife's relations with deceased. How could his status under the law have been affected by a lapse of time between his conception of the provocation and the homicide? Possessed by this insane delusion, deranged on the subject, he remained deaf to the voice of reason and to the voice of conscience. He was beyond reason and conscience in this particular, as the record clearly shows.

It is not necessary that a defendant's reason be dethroned to mitigate a killing to manslaughter. It is error so to instruct a jury. *Young* v. *State*, 30 Tenn. (11 Humph.), 200; *Haile* v. *State*, 31 Tenn. (1 Swan), 248. If the excitement and passion adequately aroused obscures the reason of the defendant, the killing will be reduced to manslaughter. *Seals* v. *State*, 62 Tenn. (3 Baxt.), 459; *Toler* v. *State, supra.* A defendant acting under such temporary mental stress is presumed to be incapable of malice, an essential ingredient of murder.

How then can malice be imputed to a defendant when his reason is not merely obscured but has been swept away and kept away by an insane delusion under which he acts? How can such a defendant be guilty of murder while his delusion persists?

The record is bare of any suggestion that plaintiff in error ever contemplated or planned the killing of Esquire Noe. So far as it appears, the two men met only twice after the marriage of plaintiff in error to Mrs. Goodwin. On the first occasion plaintiff in error, without any visible excuse, bitterly denounced and cursed the deceased. Later plaintiff in error, in conversation with others, undertook to ascribe this denunciation to some

fanciful reason. On the second meeting of the two men, plaintiff in error killed the deceased as has been heretofore detailed.

The far-fetched explanation given by plaintiff in error of his conduct upon the first meeting with Esquire Noe was doubtless put forth by him, feeling that some explanation was due, to avoid bringing the name of his wife into publicity.

A more particular discussion of the facts of the case is not required, since counsel for the State concede that plaintiff in error was possessed by an insane delusion respecting the former relations of his wife and Esquire Noe, and since counsel for the plaintiff in error in effect concede that the killing was without justification, leaving out of consideration the defense of irresistible impulse.

Upon the facts, for the reasons stated, we conclude that the verdict of murder in the second degree is not sustained by the proof.

Numerous other errors are assigned and elaborately argued, which it is not necessary to notice at length.

█ The third assignment of error criticizes an instruction of the trial judge to the effect that a non-expert witness might not testify to the insanity of another without giving the facts on which the opinion was based, but that such a witness might testify to the sanity of another without setting out the facts upon which his opinion rested. The court below followed the rule announced in *Wheeler* v. *Parr*, 3 Higgins, 374, and we think this rule is sound. In that case, in a scholarly opinion, Judge HUGHES reviewed the authorities, our own cases and others. He pointed out, while previous decisions of this court had stated broadly that a non-expert witness might not testify as to the mental condition of another

without stating the facts on which his opinion was based, that in none of those cases had a differentiation been made between such a witness testifying as to insanity and such a witness testifying as to sanity. Judge HUGHES said:

"It is clear that one who is perfectly sane, going about his ordinary avocations, and whose sanity has never been questioned, is judged by his entire course of conduct rather than by any particular incident or incidents; and to require a witness who expresses an opinion that such person is sane to give facts on which to base that opinion, further than that he has or had sufficient acquaintance with the person whose sanity is in question, or sufficient dealing or relations with him to form an opinion, would be to require the picking out of some special act or acts as distinguished from a series of thousands of acts, and to base his opinion of sanity or insanity on such special acts. This, it occurs to us, is requiring a witness to separate one sane act or a few sane acts from a thousand, and say that he bases his opinion on those, when in truth he does not do so, but rather on the acts of years, or a lifetime. On the other hand, take one whose sanity has never been questioned during an acquaintance of years and let reason become dethroned; his talk, his actions and looks will bespeak his changed condition by becoming unusual. His acquaintances notice the unusual, the changed conditions, they impress everyone and are not difficult to detail, as compared with the former condition. The changed look, talk and actions that thus impress the friend, neighbor or acquaintance is that on which the opinion of insanity is based; and it is but reasonable that the facts be given as the basis of the opinion of insanity. In other words, the exceptions to the rule attract attention and make such impressions as

that those who are called on to give reasons for noting the exceptions can give them.

"Of course, whether one has had that length of acquaintance or intimacy of business or social dealings on which to base an opinion is necessarily a question for the trial Court in the first instance, as pointed out in the case of *State* v. *Lyons, supra.* It also follows that on cross-examination of those who testify as to sanity the witnesses can be interrogated as to their opportunities for judging of the matter about which they speak; and Courts and juries in weighing such testimony should, among other things, consider the opportunities; so we see no injustice that a modification of what we have styled the old rule in Tennessee can bring to any one."

The foregoing expression of the Court of Civil Appeals is well sustained by authorities cited in the opinion and is, in our judgment, sound. In the case of *Atkins* v. *State,* 119 Tenn., 458, as in our earlier cases, the distinction taken in *Wheeler* v. *Parr* was not called to the attention of the court.

By several assignments of error complaint is made of the argument of the district attorney-general before the jury. We are satisfied, of course, that any misstatement of the evidence made by the district attorney-general in his closing argument was a mere inadvertence and will be avoided on another trial. His argument is subject to criticism, however, in the use made by him of the case of *Wilcox* v. *State, supra.* There appears to have been a detailed recital or reading of the facts of that case and a comparison of such facts with the facts of the case on trial. This, of course, was not proper. The limitations upon the reading by counsel of decisions in other cases before the jury are indicated in *Pullman Co.* v. *Pennock,*

118 Tenn., 565; *Smithson* v. *State*, 127 Tenn., 357; *Mc-Cormick* v. *State*, 135 Tenn., 218, and 2 Enc. Pl. & Pr., 710, approved by the court in *Smithson* v. *State*.

Some faults are found with the charge of the court. The trial below was long and counsel for the defendant below were indefatigable and resourceful. It was hardly possible under the circumstances for any judge to frame instructions covering all points in a manner as satisfactory to counsel as he might do upon a second trial. So far as any of the language used by the trial judge is subject to criticism, we are satisfied it will be corrected when the case is heard again. On the whole the charge was accurate and fair.

Reversed and remanded.

### On Petition To Rehear.

In disposing of this case formerly, concluding our discussion of the proof, we said:

"A more particular discussion of the facts of the case is not required, since counsel for the State concede that plaintiff in error was possessed by an insane delusion respecting the former relations of his wife and Esquire Noe, and since counsel for the plaintiff in error in effect concede that the killing was without justification, leaving out of consideration the defense of irresistible impulse."

A petition to rehear is filed in which counsel for plaintiff in error disclaimed the concession ascribed to them and support their disclaimer by references to the brief. The court is asked to recall the language of the opinion which attributes such a concession to counsel. This, we accordingly do.

We desire to be understood as having said in this connection that a further discussion of the facts was omitted, since the State conceded that plaintiff in error was pos-

sessed by an insane delusion respecting the former relations of his wife and Esquire Noe, and since, upon the record before us, we found no such preponderance of evidence against the verdict of the jury as would justify the court in interfering therewith, leaving out of consideration this insane delusion and irresistible impulse arising therefrom.

We are further asked in the petition for a rehearing to specifically rule on several assignments of error which we did not regard of particular importance, and did not notice in the opinion. We pass on these matters as follows:

The seventh assignment of error is sustained.

The eighth assignment of error is sustained.

The ninth assignment of error is overruled. There was no request for additional instructions in this connection.

The twelfth assignment of error is overruled. We pointed out in the opinion that so far as the district attorney-general misstated the proof, this was an inadvertence and would not occur again.