HARRY LONG

*v.*

STATE OF TENNESSEE

(*Jackson,* April Term, 1957.)

Opinion filed June 7, 1957.

Rehearing Denied July 29, 1957.

L. L. Fonville and Carmack Murchison, Jackson, for plaintiff.

Nat Tipton, Advocate General, for the State.

Mr. Justice Swepston delivered the opinion of the Court.

Harry Long, hereinafter called defendant, was convicted for the homicide of Robert Foster, was found guilty of murder in the first degree and sentenced to 30 years confinement in the State prison, from which he has appealed.

The first four assignments of error require the discussion of the evidence.

 Under these assignments it is insisted that either the defendant was temporarily insane or he was acting under the influence of a delusion so that he could not be guilty of murder in the first degree.

The defendant at the time of the trial was a man 51 years of age, lived on and operated his farm in Madison County a few miles from the City of Jackson and bore a good reputation in the community for peace, quietude and integrity. In 1927 he was married to Gladys Ivey, with whom he lived until they were divorced in 1939. At that time their only child, a son, Harry Sykes Long, was 9 years of age. Custody of the child was awarded to the mother but she permitted the boy to visit his father on week ends during the school years and during vacations at practically any time his father or the boy so desired. In 1943, the former Mrs. Long married Robert Foster who at the time of the homicide was 39 years of age. They lived on a farm some 6 miles away from that of defendant. In 1950 or 1951 the son, Harry Sikes Long, married Rosalee Reid at which time this couple moved into the home of the defendant, the boy's father. Three children were born to this union and up until a few days preceding this tragedy the son and his family occupied the home of defendant who reserved a room for himself and they seemed to have made a happy home for the defendant.

There is not any suspicion that the marriage of the deceased to defendant's former wife played any part at all in the tragedy; while there is an undertone of lack of

any interest in each other between the defendant and his former wife, the record is clear that the defendant and the deceased were at all times on good terms with one another except the few days preceding this tragedy, and that the son, Harry Sykes Long, was fond of his stepfather, Foster, and that the latter was fond of the boy; in fact, they swapped work on the farm with one another, the boy operating part of his father's farm and they loaned each other their farm machinery. In fact, as will later appear, the tractor and combine belonging to Foster was at the home of the defendant when the homicide occurred and about three days before that the defendant had telephoned Foster to come and get his machinery, although no time was specified or agreed upon as to when Foster would obtain the same and the record will justify an inference that the defendant knew just when Foster would arrive, and as a matter of fact, about three days elapsed before Foster showed up early on the morning of July 14, 1955, when the tragedy occurred.

Sometime prior to July 4, 1955, the defendant's son had begun to act peculiarly; he could not remain working in the field steadily but would ride back to the residence frequently during the day; he appeared to be unwell; he left the farm and obtained a job in a hardware store in Jackson where he remained for a short while until his father persuaded him to come back to the farm. Finally, on the night of July 3rd he left home about midnight and did not return until early in the morning. His wife, Rosalee, went into her father-in-law's room and told him the trouble was that her husband thought she was carrying on with Bob Foster.

When young Long returned early that morning his face was swollen and he had a very harried look about him. He was taken to Memphis that day to a private sanitarium, but he was so violent he could not remain there, because the sanitarium was not equipped to handle people in his condition. Finally on July 8th he was committed to and placed in the Western State Hospital at Bolivar, where because of his violent condition he had to be rather closely confined and restricted in the use of his arms.

The day he was taken away from home his wife took the children and removed from the home of the defendant to the home of her parents and has not returned. This left the defendant in the house by himself with his family life broken up and his son in this lamentable condition and the record amply reflects that he was greatly disturbed, was unable to sleep even after taking strong sedatives or barbiturates and that he had begun to adopt the suspicion or illusion which his son had been laboring under to the effect that Robert Foster was trying to take his son's wife away from him.

His former wife testified that after their son became sick, defendant said to her that he had better not find who was the cause of Harry Sykes' being in that kind of shape; this was said in the presence of the deceased and Mrs. Foster's sister. A Negro man who worked for him on the farm testified that defendant told him that the deceased was the cause of his son's being in the Western State Hospital and the witness noticed that the defendant was crying some. Subsequent to the homicide he made the statement to several people at different times, that the deceased had broken up his home.

On the one hand, the record shows the defendant was greatly grieved at his son's condition, was quite naturally greatly perturbed and upset, was continually talking to first one person and then another about the pitiful condition of his son and about his home being broken up; that several witnesses experienced difficulty in trying to talk business affairs with him; and that his sleepless nights and days continued for five or six days on up to and including the night before the tragedy.

Although defendant was affected with hardening of the arteries, an ulcerated stomach and a rupture, no history of insanity, or bad mental condition appears.

On the other hand, there was evidence before the jury that on the morning of the tragedy the defendant awakened about 5:00 o'clock, went down to a tenant house a short distance away and awakened a Negro man and his wife and instructed them to go out and pick a bushel of butterbeans and take them to Jackson to a certain market; that after they had gone to the field, the defendant took a basket and went out to where they were and picked two or three tomatoes and then went back to the house. About an hour later the deceased and a Negro man with him showed up in a pickup truck which was driven in the driveway and headed south toward the garage where it was stopped. Both men got out of the truck and deceased went toward the back of the house where there was a screened back porch and when he was about five feet away the defendant shot one time at him with a .22 calibre target pistol, firing the bullet through the screen wire. The Negro man took out across the field, ran over to the home of the father of the deceased and told him about the trouble there. The deceased began

running out of the driveway to highway No. 70m and then on down the highway with the defendant chasing him and firing at him from time to time until they had traveled $4/10$ths of a mile away from the defendant's driveway where deceased fell face down and expired. The proof is that this pistol held either 9 or 10 bullets and the defendant emptied his gun shooting at deceased although only four bullets struck him.

Shortly afterwards the sheriff was notified and two deputies came out to make the investigation. Defendant stated to them that he had killed a snake, that he had shot Bob Foster; that when Foster appeared at the back of the house he accused him of having broken up his home and Foster said, "No, I didn't," whereupon he started shooting. After showing where they were both standing he then stated that as they ran along the highway he had emptied his gun at the deceased and at first started to go back to the house and reload but that a "spark of humanity hit him," and he decided not to do so. He then stated that he would rather talk to an attorney before he made any more statements. He seemed a little nervous and was crying a little occasionally but he talked some of the weather and the crops and seemed to be normal and knew right from wrong. The officers then arrested him and when they got in the car he asked them to stop at Lawrence's Grocery on the way to Jackson so that he could ask Mr. Lawrence to go on his bond.

Paul Ivey, brother of Mrs. Foster, testified that about 45 minutes after the shooting the defendant said to him, "Did you hear about old Bob Foster, I shot the hell out of him!" He told him also that he started to go back to the house and get some more shells but a "spark of hu-

manity hit him" and he didn't do it. Also said he hoped the S.O.B. was dead, etc., and that he could now sleep at nights. Defendant stated also that he himself had called the sheriff and he seemed to be fretted because the sheriff was so long in getting out to him. A witness said he had called the sheriff. The defendant stated to several other people that he had killed a snake.

The defendant testified in his own behalf. He stated that he remembered a good many things that occurred before the homicide, although there were certain other things he did not remember, but his testimony was that he remembered nothing from just before the homicide until after he had been in jail about three weeks when his mind cleared up.

The State called a rebuttal witness, the sister of Mrs. Foster, who testified that prior to the homicide the defendant made the statement that if his son did not get well, Mrs. Foster, the son's mother, would pay through the nose. This last is the subject of an assignment which will be discussed hereinafter.

In view of the above recital of the evidence and particularly in view of the fact that practically every witness who talked to him or observed him just before and after the homicide did not observe any evidence of any lack of ability on his part to determine the difference between right and wrong. That, of course, is the test of insanity in this State, as set out in *Davis v. State*, 161 Tenn. 23, 28 S.W.2d 993, which is known as the McNaughten's rule, which by the way, is the subject of an article in the October 1956, A.B.A. Journal. The jury was, therefore, fully warranted in failing to find that he was temporarily insane.

Assuming, therefore, that he was not insane, his statements above referred to made both before and after the homicide show very strongly that he felt revengeful against somebody in the beginning of his trouble and eventually this feeling was centered on the deceased as being the person responsible, so that when he expressed a sense of satisfaction and relief at the death of deceased and gave no evidence of any regrets over the event, the jury was well warranted in finding that he did not on that morning act on a sudden impulse but with premeditation and deliberation. And where there is premeditation, there is also necessarily express malice.

Counsel for the defendant take the alternative position, however, that, if they are wrong in their insistence that defendant was insane and, therefore, not capable of being guilty of a criminal offense, because the proof may show that he knew the difference between right and wrong, nevertheless, defendant cannot be guilty of murder but only of manslaughter, because of his laboring under an insane delusion. The case of *Davis v. State,* 161 Tenn. 23, 28 S.W.2d 993, 996, is relied upon in support of this theory. In that case the jury after some deliberation returned to the Courtroom and reported they had found the defendant was insane on the subject of the relations between his former wife and the deceased, but they further found the defendant knew the difference between right and wrong, and they asked the Court what they should do.

Green, Chief Justice, in reducing the conviction to voluntary manslaughter first referred to the McNaughten rule in the following language:

"The right and wrong test above mentioned was authoritatively laid down in McNaughten's case, 1 C. & K., 130 8 Eng. Reprint, 718. Under that case and those following it a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed, would have excused the defendant."

The opinion then holds that while the defendant was not wholly excusable from guilt, yet with the erroneous belief so fixed in his mind that the deceased had debauched his wife prior to the marriage, he was not capable of listening to the voice of reason. The opinion then states:

"We are of opinion that if as a matter of fact the deceased had debauched the wife of plaintiff in error and the plaintiff in error had been apprised of that fact and had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition while under the influence of passion and agitation produced by such information, had killed Noe, he would only have been guilty of voluntary manslaughter."

A similar case was recently decided by this Court styled *Whitsett v. State,* reported in 201 Tenn. 317, 299 S.W.2d 2. Those cases, however, are not analogous on the facts to the case at bar. (1) In each of those cases the relationship was that of husband and wife. (2) The guilt of the deceased was believed by the defendant to be a fact. (3) The evidence did not indicate the idea of revenge, but rather a sudden emotional outburst of passion. (4) The provocation was one recognized in law as adequate.

In the present case the situation is (1) the relationship of the female was that of daughter-in-law to the defendant. (2) There was no wellfounded belief that the female was guilty of adultery with the deceased but only the suspicion in both the minds of the husband and his father, the defendant, of improper conduct and that the deceased was trying to take her away from her husband; the farthest the evidence goes is that the lady herself stated to her father-in-law on the night of July 3rd, that her husband thought that she was "carrying on" with Foster, and the witness Strickland testified that the defendant said, "we have the dead wood on him." (3) There is a substantial amount of evidence of premeditation, and(4) The provocation was not such as is recognized as being sufficient in law; the complaint expressed by the defendant to numerous persons was not the suspected attempt to debauch the female with a consequent effect upon her in case the intention was realized but the essence of the complaint was the effect upon his son who became insane and was placed in the Western State Hospital and the effect upon the defendant himself whose home was broken up by the departure of his son and his son's family.

The brief of the State avers that no case can be found where a daughter-in-law is included within the class which would permit a reduction of the crime from murder to manslaughter. That may be true and yet we are not willing to commit ourselves unqualifiedly to such a rule because there might occur in the future instances where such a rule ought not to be applied. We simply hold that in this case the mere suspicion that the deceased was intending or attempting to debauch the

daughter-in-law, would not be a sufficient provocation to reduce the offense to voluntary manslaughter. 40 C.J.S. Homicide sec. 49, p. 914, note 93. These assignments relating to the evidence are, therefore, overruled.

The 5th assignment complains of the refusal of the Court to give a special request. The substance of this is adequately included in the general charge and it was not error to refuse the special request.

The 6th assignment complains of the refusal of the Judge to charge as follows:

"I charge you further that, if you should find that the defendant was capable of distinguishing right from wrong, but was nevertheless acting under an insane delusion at the time of the killing, he would not be guilty of murder either in the first or second degree. He would be guilty of no more than voluntary manslaughter."

There was no error in this action of the Court because the requested instruction is incorrect in that it makes any insane delusion a bar to a conviction for murder whereas, under the McNaughten rule, supra, the delusion must be as to something believed to be a fact, which if a fact indeed, would have excused the defendant.

The 7th assignment complains of what was in fact an improper question on cross-examination of a character witness in behalf of the defendant which question was whether the witness knew that a petition had been circulated and the defendant's place of business closed up because he was selling beer. Since the question was not answered, however, with reference to the beer part we do not see how it could be prejudicial.

■ The 8th assignment complains that the Court permitted the State in rebuttal to offer the testimony of the sister of the widow of deceased to the effect that if his son did not get well she would pay for it through the nose. Authorities are cited for the proposition that threats by the accused against the third party are not admissible. 30 C.J. 155; 40 C.J.S. Homicide sec. 206(a), p. 1108, is cited in support of this but the same Volume, page 191, holds that such threats are competent and admissible if made against the party connected with the transaction. Id., 40 C.J.S. sec. 238, p. 1170. We think they were properly admitted in this case.

All assignments of error are, therefore, overruled and the judgment below is affirmed.