**Norman Cline MEADE, Plaintiff-in-Error,**

v.

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.
June 14, 1972.

Certiorari Denied by Supreme Court
Aug. 21, 1972.

B. C. McInturff, Kingsport, for plaintiff-in-error.

David M. Pack, Atty. Gen., J. B. Hagler, Jr., Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Kingsport, for defendant-in-error.

## OPINION

RUSSELL, J.

■ Meade was caught in the act of burglarizing a business house in Kingsport. He was indicted for the offense, and charged in a second count with being an habitual criminal. Upon the first part of the bifurcated trial he entered a plea of not guilty by reason of insanity at the time of the crime. There was absolutely no question but that he committed it. About the only evidence of insanity at that time was the testimony of a clinical psychologist who opined that he was insane, based upon one session with Meade that lasted about an hour and was conducted many months after the crime. The jury was certainly justified in rejecting this expert testimony as incredible.

Meade was caught inside an automobile garage, in the perpetration of a burglary. He had broken into the building, into the cash drawer and filing cabinets in the office, collected valuables, and had his collection on a mechanic's cover cloth to bundle up and facilitate their transportation when the officers arrived. Then, very rationally, he went upstairs and hid and stayed there until found. When caught he was rational and reasonable, declined to make a statement, and asked for a lawyer.

He was a man who held a job in a hospital around medical people immediately before and after the crime, has a long history of criminality, and there is absolutely no evidence that he has ever been insane. Meade's theory is that he had an onset of temporary insanity that came upon him suddenly and kept him from knowing what he was doing when he broke into the business house, or that it was wrong; but did not cause him to be insane after he was returned to reality by arrest. Now, Meade didn't so testify; but he presented a clinical psychologist who interviewed him for one hour one time one year after the fact and theorized that probably he was temporarily insane. We have carefully reviewed this testimony and can understand why the jury and trial judge rejected it. We find it to be totally incredible. We are reminded of the language of our Supreme Court in the case of Mullendore v. State, 183 Tenn. 53, 191 S.W.2d 149 (1945):

"* * * A psychiatrist was introduced on behalf of defendant, [sic] testified that defendant was insane. He had made an examination of defendant for about thirty minutes some two weeks before the trial. He kept no record of the examination and could not even be exact about the date of its making. His admissions on cross-examination showed that the examination was casual and incomplete. He showed himself an advocate rather than a dispassionate expert, and the jury was justified (when they weighed his testimony, as they had a right to do, Haskins v. Howard, 159 Tenn. 86, 16 S.W.2d 20) in concluding that he was employed rather than called for the defense. The attitude of obvious partisanship displayed by this nominally expert witness, furnishes convincing evidence of the wisdom of the rule laid down by this Court, that expert testimony is to be received 'with great caution;' (citing cases) and that the weight to be given it is a question for the jury under careful instruction of the trial judge. Haskins v. State, supra. The actions and words of defendant before, at, and immediately after the commission of the crime, were as convincing evidence of his sanity as they were of his sobriety, so we feel the jury had material evi-

dence on which to disregard the opinion of the expert witness."

The language of Mr. Justice Gailor in *Mullendore* is appropriate to this case. Unquestionably the verdict of guilty of third degree burglary is well supported by legally sufficient evidence.

■ We attach no controlling importance to the fact that the charge as to insanity appears to have been incomplete. No error has been assigned upon the charge. No question was raised about it below. See Rules 14(4) and 14(5) which provide that no such question could even have been raised here for the first time. Certainly we should not raise it; most especially in view of the fact that to do so we are assuming that the record has not been abridged to deliberately leave out portions that have no relevancy to the errors assigned, as is positively required by Rules 1 and 2. And the most that can be said about the charge is that it was incomplete, rather than erroneous; and nothing appears to indicate that further instruction was requested. Mere meagerness of the charge, if correct as far as it goes, is not reversible error where there is no special request for additional instructions. Lunn v. Ealy, 176 Tenn. 374, 141 S.W.2d 893; McClard v. Reid, 190 Tenn. 337, 229 S.W. 2d 505; Bluff City Buick Co. v. Davis, 204 Tenn. 593, 323 S.W.2d 1. In the last named case, we find:

"* * * This Court has held for more than 100 years that we would not reverse a case for meagerness, inadequacy, etc., or failure to give a charge unless a special request is asked which correctly sets forth the points to be charged. McClard v. Reid, 190 Tenn. 337, 229 S.W.2d 505. This has been followed invariably in criminal cases for reasons set forth in various and sundry opinions which may be found by reference to either the case last cited or that of Gentry v. State, 184 Tenn. 299, 198 S.W.2d 643. * * *"

■ In the second phase of the trial habitual criminality was well established by proof of five or more prior convictions. Unquestionably the convicting proof is legally sufficient on that count, also.

■ We note that a punishment for the burglary of three (3) to nine (9) years was set by the jury upon trial of the first count, and that life imprisonment was assessed upon the finding of habitual criminality; and that the trial judge pronounced judgment setting both punishments. We believe the law to be that habitual criminality is a status, not an offense; and its finding calls for an enhancement of the punishment for the new offense (burglary) to life imprisonment. T.C.A. §§ 40–2801, 40–2802, 40–2805, 40–2806; Canupp v. State, Tenn.Cr.App., 460 S.W.2d 382. Life imprisonment is, therefore, the enhanced punishment for the burglary in this case; and that part of the judgment setting a separate punishment of three (3) to nine (9) years for burglary is declared to be null and void.

■ Evidence was introduced upon the first phase of the trial that Meade had kidnapped and robbed a nurse of her car, money and credit card; and subsequently used them to carry a female companion on a two-day round-trip "flight" to Florida. It is vigorously argued that the State introduced this evidence to get the fact of the other later crimes before the jury, and not to show guilt by flight.

We do not deem it necessary to decide the admissibility of this evidence. Assuming that proof of the other crimes was erroneously before the jury, such error has to be harmless in the context of this case. Meade admits the burglary (having been caught in the act) and defends upon his alleged insanity. (Argument could be made that the evidence of other later crimes was relevant to the sanity issue, especially in view of the testimony of his psychologist tending to tie his criminality strictly to insanity. Where ones' state of mine is an is-

sue, all conduct at relevant times is probative.) Since his guilt is clear, and his ultimate punishment set by law, we hold that any error committed in allowing proof of later crimes on the theory that they demonstrated guilt through flight to have been harmless, and in our opinion did not affect the result of the trial. T.C.A. § 27–117. (Further corroboration of the flight theory is reflected in the record, by the fact that Meade failed to appear in Court later, and both preliminary and final forfeitures were taken upon his bond.)

■ Jury argument of the prosecuting attorney is assigned as error. We would observe that this was a bitterly contested trial, with the State's attorney and Meade's retained counsel demonstrating much zeal. We have carefully examined all of the complained-of argument and find no reversible error. The general test to be applied is whether improper argument could have affected the verdict to the prejudice of the defendant. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1964).

■ The assignment complaining that the trial court erred in overruling defendant's motion to quash the habitual criminal count on the grounds that it did not show the time and place where the crime occurred or who the prosecutor was is without merit. See T.C.A. § 40–2803, which provides a readily available procedure for obtaining such information.

■ Error is assigned upon the alleged refusal of the trial judge to allow the introduction of evidence attacking the validity of the root convictions supporting habitual criminality. We do not find that this happened. What the trial judge did hold was that evidence as to the disposition of a co-defendant's case was incompetent. We noted no tender of proof that Meade's prior guilty pleas were coerced, or that he was denied effective assistance of counsel.

Meade is clearly guilty of this burglary, and his defense that he was momentarily insane has no credible support in the evidence and has been resolved against him by the jury. His status as an habitual criminal is clearly demonstrated, with convictions to spare.

Affirmed.

GALBREATH, J., concurs.

GALBREATH, Judge (concurring).

If any credible defense at all had been advanced on behalf of the appellant, the clearly erroneous admission of proof of unrelated criminal activity on the burglary trial would, in my opinion, force reversal. An escape or failure to appear for trial is a circumstance inconsistent with innocence and relevant to the principal issue of guilt. Mitchell v. State, Tenn.Cr.App., 458 S.W. 2d 630. Unrelated crime that might be committed during such period of absence has no relevancy and is clearly prejudicial in most cases. But since under the uncontroverted facts of this case the defendant broke into the business establishment as alleged and he had previously been convicted of more than the required number of the enumerated felonies to establish habitual criminality, I agree with Judge Russell that upon the collapse of the affirmative defense offered—insanity at the time of the commission of the crime—the admission of the incompetent evidence could not have affected the verdict of guilt or the punishment fixed by law.

OLIVER, Judge (dissenting).

As I view it, this record demonstrates prejudicial errors requiring disapproval of the defendant's conviction.

Notwithstanding the fact that the defendant did not testify, unquestionably the defense evidence raised a question concerning his sanity at the time of the offense. His wife, holding a Bachelor of Science degree from the University of Kentucky and employed in the mental health department of that state as a registered nurse, testified that he had always been extremely

nervous and easily upset; that when she saw him at the police station early the next morning after his arrest he was very nervous, upset and apprehensive, was very pale and his eyes were red and he cried at different times while she was there; that "He seemed to know then fairly well where he was," but questioned her about what had happened and did not fully realize what was going on; that he had been in failing health for about a year and a half; and that on the day of this offense he had attended his father's funeral.

Dr. A. Sheldon Gelburd, a clinical psychologist holding a Ph.D. in psychology from the University of Tennessee and practicing in Kingsport, detailed his hourlong interview with the defendant in the Sullivan County Jail which apparently occurred on July 22, 1971, more than a year after the offense, and with the defendant's wife and others, and explained the standard psychological tests administered to him. He testified that the defendant has an Intelligence Quotient of 84, and that "He didn't try to act crazy at all." By cross-examination of this witness the District Attorney General brought out that when the defendant was 15 years old he was institutionalized in the Clover Bottom Hospital. The District Attorney General then undertook to neutralize that testimony by repeatedly suggesting that that institution is not a mental hospital and by telling him that he knew better than to say it was in the face of the fact that by T.C.A. § 33–201 that institution is designated as "Clover Bottom Hospital and School, at Donelson, for the mentally retarded." In sum, Dr. Gelburd's stated opinion was that the death of the defendant's father triggered a psychological condition which caused him to lose contact with reality and rendered him temporarily insane so that he did not know what he was doing when he entered the business establishment and did not know the difference between right and wrong.

The applicable principles of law were settled long ago in this State. The presumption of sanity places the burden of showing insanity at the time of commission of a crime upon him who asserts it as a defense. Mullendore v. State, 183 Tenn. 53, 191 S.W.2d 149; Spurlock v. State, 212 Tenn. 132, 368 S.W.2d 299.

While the State is not bound to establish the defendant's sanity in the first instance, if the defendant's or the State's evidence raises a reasonable doubt as to the defendant's sanity, such evidence relieves the defendant of further proof upon that issue and shifts the burden of proof to the State. Stuart v. State, 60 (1 Baxt.) Tenn. 178; King v. State, 91 Tenn. 617, 20 S.W. 169.

Whenever testimony is introduced countervailing the presumption of sanity and raising a question of the accused's insanity, the State must then establish his sanity to the satisfaction of the jury beyond a reasonable doubt. Jordan v. State, 124 Tenn. 81, 135 S.W. 327; Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L. Ed. 750, 754.

Of course, confronted with the evidence countervailing the presumption of sanity and definitely raising a question of the accused's insanity, the State then undertook to discharge its obligation of proving his sanity beyond a reasonable doubt. In making that effort, in addition to attempting to discredit Dr. Gelburd by cross-examination, the State relied upon the testimony of four witnesses. The first of these was one of the arresting officers, who testified that he talked with the defendant the same night he was apprehended and placed in jail, and that he knew where he was and what he was doing and what he was charged with and told him about his father being buried that day; that the defendant was limping and walked with a cane and that he told him he ought to be in the hospital instead of there at the motor company building; that he also told the defendant "he was crazy as hell for being down there" and had in mind in making that statement the fact that his father had been buried that morning, that he had been injured and was limping and "then going out and doing this

burglary" was a case of poor judgment. The other arresting officer testified that the defendant stated he understood his constitutional rights and what he was charged with, and that Meade told him, in response to inquiry, about his father's death; that the defendant was hidden in the building and obeyed the officers' command to come out with his hands up, and that in his car they found part of a bottle of whiskey; and that he was with the defendant "not over three to five minutes, at the most" before driving him to the police station.

In rebuttal the State presented the bondsman and the jailer. The bondsman testified that he talked to the defendant a few minutes on June 2, 1970, while making his appearance bond, and that he had never known the defendant before that time; that the defendant did not show any signs of mental illness or that there was anything wrong with his health or sanity. On cross-examination this witness admitted that he paid no attention to the defendant one way or the other and never thought anything about his sanity until he talked with the District Attorney General's criminal investigator the morning of the trial. The jailer testified that the defendant seemed to know where he was and what he was charged with and exhibited no indication of insanity. The jailer testified on cross-examination that the defendant wanted to know if he would get his belongings back when he got out of jail, "That's about all he said to me"; and that he put him in a cell and heard nothing out of him the rest of the night and thought nothing about whether he was sane or insane until the day of the trial.

Of course, it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution, and that where there is any conflict between expert testimony and non-expert testimony as to determinative facts, the jury is not bound to accept expert testimony in preference to other testimony and must determine the weight and credibility of each in the light of all the facts shown in the case; and that insanity as a defense in a criminal prosecution is a question of fact to be determined by the jury *under proper instructions by the court.* Sparkman v. State, Tenn.Cr.App., 469 S.W.2d 692.

However, it is implicit in the rules just stated and in the law governing appellate review that the jury's verdict must be supported by substantial material evidence. A mere wisp or flimsy shred of evidence is not enough to sustain a criminal conviction. The scintilla rule is not recognized in this State. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856.

Can there be any doubt that the State wholly failed to carry its burden of establishing the sanity of the accused beyond a reasonable doubt? Its evidence introduced for that purpose, reviewed above, can only be characterized as mere insubstantial surmise wholly lacking in probative value. A non-expert witness offered to establish the sanity of a person must show such acquaintance with that person and such opportunity of observing him as to enable the witness to form a definite opinion. Davis v. State, 161 Tenn. 23, 36–38, 28 S.W.2d 993. Evidence of incapacity by a lay witness must be based upon a predicate of reasonable and substantial facts. Schlickling v. Georgia Conference Association Seventh-Day Adventists, 49 Tenn.App. 412, 480, 355 S.W.2d 469.

"Evidence" does not consist of vague, uncertain, irrelevant matter not carrying the quality of proof to induce conviction. McDonald v. Robertson, 104 F.2d 945 (6th Cir. 1939). By the term "evidence" is meant something of substance and consequence, carrying the quality of proof and having fitness to produce conviction. Pioneer Coal Co. v. Lisenbee, 276 Ky. 308, 124 S.W.2d 94. "Substantial evidence means such pertinent or relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Schlickling v. Georgia Conference Association Seventh-Day Adventists, supra. The

Court also said in *Schlickling*: "The mere dogmatic assertion which does not appeal to the reason of the court, which does not have substantial and relevant consequence, which does not have fitness to induce conviction, is not proof even if uncontradicted, . . ."

Pertinent and helpful in considering the problem confronting us in this case are the following statements in Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957):

". . . But the opinion to which a psychiatrist testifies, need only be 'the type of clinical opinion he is accustomed to form and to rely upon in the practice of his profession.' It need not consist of 'mathematically demonstrable certainties.' Blunt v. United States, 1957, 100 U.S. App.D.C. 266, 275, 244 F.2d 355, 364.

\* \* \* \* \* \*

"Although the testimony of lay witnesses may be competent evidence on the issue of sanity, it does not follow that, in the face of a substantial showing of insanity, the Government may send the issue to the jury simply by having two policemen testify, 'He looked all right to me.' The probative value of any opinion on the issue of sanity depends on the facts upon which it is based. This is especially true of a lay opinion. Lay 'witnesses may testify only upon the basis of facts known to them. They may testify as to their own observations and may then express an opinion based upon those observations. Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training. Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused.'

Carter v. United States, 102 U.S.App.D. C. 227, 252 F.2d 608."

Our Supreme Court said in State v. Holt, 222 Tenn. 721, 440 S.W.2d 591, reversing and remanding because the trial judge declined to permit a psychiatrist to testify about the sanity of the defendant based on examination some five or six months after the offense was committed:

"In 31 Am.Jur.2d, Expert and Opinion Evidence, Section 86, the following statements are made:

Probably in no class of cases is the use of expert testimony so general and almost indispensible as in that where the issue is sanity or insanity. Unless a person is a raving maniac or complete imbecile, it is evident that a jury can hardly be deemed competent to reach a satisfactory decision on the question of his mental condition without being instructed by expert witnesses as to the manifestations of mental derangement or disease and the significance of symptoms which are in evidence."

Considered in the light of all the foregoing, surely it cannot be said that the State sustained its burden of proving the defendant's sanity beyond a reasonable doubt by the essentially negative testimony of the four laymen presented, who manifestly had no knowledge about such matters and whose testimony as already noted could not be considered as "evidence" upon that issue at all.

Moreover, although the defendant makes no complaints here about the trial court's charge, it cannot be overlooked that the court only instructed the jury concerning the presumption of sanity and that when insanity is interposed as a defense to a criminal charge the burden of proof is upon the party alleging it. But the court did not instruct the jury, as he was required to do, that if the defendant or the State introduces any evidence fairly raising doubt upon the issue of the accused's sanity at the

time of the offense, the presumption of sanity ceases to exist and the State then has the burden to establish his sanity beyond a reasonable doubt. Jordan v. State, supra; Davis v. United States, supra. Thus, the jury was never instructed that any burden of proof rests upon the State whenever evidence countervailing the presumption of sanity and raising a question of the accused's insanity is introduced.

In my view the defendant's second Assignment of Error is meritorious. He contends that the trial court erroneously admitted the testimony of Mrs. Marjorie Stansbury and Miss Imogene Webb. The events referred to in their testimony occurred before the trial while he was free on bail. Mrs. Stansbury testified that the defendant forced her at knife point to drive him to a remote area where he tied her up and took her automobile and her purse containing her Esso credit card and about $30. Miss Webb testified that she and the defendant went to Miami, Florida in the Stansbury vehicle and that she used Mrs. Stansbury's credit card to buy gasoline; that after arriving in Miami the defendant visited his brother for approximately 10 minutes and they then started back to Tennessee; and that the entire trip lasted about two and a half days. The record makes it plain that the purpose in introducing the testimony of Mrs. Stansbury and Miss Webb was to bolster the State's contention that the defendant fled from the State of Tennessee to avoid prosecution, by showing that he kidnapped Mrs. Stansbury and robbed her by the use of a deadly weapon. This record completely refutes the contention of flight by the defendant. He was back in Sullivan County within two and a half days after he started the trip to Florida, and there is no evidence that he concealed himself from the time he returned until the date of his trial. There was no basis for the introduction of evidence of other crimes under any exception to the rule prohibiting such proof. Even

in the District Attorney General's cross-examination of Dr. Gelburd he elicited and brought out that the defendant was in prison seven years, one month and 18 days, and the court overruled defense objection to that testimony. And the District Attorney General then asked Dr. Gelburd if he examined the defendant's psychological record at the Tennessee Penitentiary, "The work up that was done there by the Psychologist." Again defense objection was overruled. And all of this was during the first phase of the trial upon the burglary count of the indictment.

Furthermore, the defendant's Assignment of Error complaining of the arguments of the District Attorney General is eminently well taken, in my opinion. If the District Attorney General's arguments, both with respect to the first phase of the trial and later with respect to the second phase in which the defendant was charged and convicted as an habitual criminal, especially as to the latter, were not grossly improper and prejudicial, it is difficult to conceive of arguments that could properly be classified as inflammatory and calculated to incite and prejudice the jury against the defendant. The plain total effect of the State's arguments was to brand the defendant as a vicious criminal who should be put away. Convictions so obtained cannot be permitted to stand.

For these reasons, it is my opinion that the defendant did not have a fair trial and that we have no alternative but to reverse and remand this case for a new trial. Almost a hundred years ago, in Stokes v. State, 64 (5 Baxt.) Tenn. 619, the Supreme Court of this State said:

"Although we might be satisfied of the prisoner's guilt, yet it is our duty to see that he has a fair and impartial trial, and this he must have though costs may accumulate and punishment be long delayed."