ALBERT SCHLICKLING, Conservator of the Estate of Magdelena S. Fehn, Incompetent, Appellee, v. GEORGIA CONFERENCE ASSOCIATION SEVENTH-DAY ADVENTISTS, Appellant.—355 S. W. (2d) 469.

Western Section. Sitting for Eastern Section. July 1, 1961.

Petition for Certiorari Denied by Supreme Court, February 8, 1962.

414

Noone & Noone, Chattanooga, for appellant.

Moon, Harris & Dineen, Chattanooga, for appellee.

James L. Banks, Chattanooga, guardian ad litem.

AVERY, P. J. (W. S.) This suit originated in the Chancery Court of Hamilton County and is a suit by Albert Schlickling as Conservator of the estate of Magdelena Schlickling Fehn, his sister, having been appointed such Conservator on the 22nd day of June, 1959, against the Georgia Conference Association Seventh-Day Adventists, a corporate entity, chartered under the laws

of the State of Georgia, by which he seeks to set aside a deed executed by his said sister, dated September 1, 1953, in which she conveyed certain real estate in Tennessee to defendant, and two deeds executed on the 1st day of September 1953, in which she conveyed certain real estate located in Walker County, State of Georgia, to defendant, said deeds being Exhibits "A", "B" and "C" to the original bill, and a Power of Attorney executed by his said sister on March 11, 1959, recorded March 28, 1959 in Walker County Georgia, to the defendant, all of said documents or certified copies are exhibited with the proof, which deeds show that she reserved a life estate in said properties.

The parties will be referred to in this Opinion in the following manner: Albert Schlickling, the original complainant as Conservator, will be referred to by the name "Schlickling", his sister will be referred to by the designation, "Mrs. Fehn", The Georgia Conference Association Seventh-Day Adventists will be referred to as "defendant". In the course of the proceedings other parties were made defendants and if referred to as such separate defendants in this Opinion, it will be by their respective surname.

A supplemental bill was filed against defendant on August 17, 1959, by which Schlickling sought to require Charles A. Noone, one of the solicitors for defendant, to file with defendant's answer, all statements taken by a court reporter of a conference between him, the said Noone and Mrs. Fehn, which was alleged to have been recorded by a court reporter and purported to be a conference and conversation interpreted by a German interpreter, and enjoining defendant, its agents, etc. from

"going about, harassing, or any way communicating with said Magdelena S. Fehn."

The bill is predicated on the facts charged to be that when said deeds and Power of Attorney were executed, the said Mrs. Fehn was mentally incompetent and that they were the result of undue influence exerted on the part of agents and representatives of the defendant. The original bill also averred that during this interim between the time the deeds were executed and the original bill filed, that defendant had prevailed upon the said Mrs. Fehn to execute a will leaving any property she might have at her death, to it, and it also sought a surrender of all wills which Mrs. Fehn might have executed and in possession of defendant, together with any other documents and papers which might have been executed by her and held by defendant. The original bill had narrated a situation wherein the complainant had referred to certain litigation between Martha M. Schlickling, a former wife of the complainant and said Mrs. Fehn, which had caused a severe mental strain and much harassment of Mrs. Fehn and had caused her great expense.

Defendant filed a demurrer to that part of the bill which sought the surrender of the alleged will on the theory that the bill sought to have a hearing devastavit vel non contesting such will while the alleged testator lived.

Without waiving the demurrer so filed, on August 20, 1959, defendant filed an answer and cross-bill in which they admit the conservatorship, but averring that Schlickling is an unfit person to serve as conservator. This answer refers to the litigation involved in the lawsuit by the former wife of Schlickling and that Schlick-

ling was involved in two lengthy and continuous lawsuits with his said former wife. The answer admits the conveyances to it by Mrs. Fehn, and further alleges that Mrs. Fehn did execute a security deed to Schlickling conveying certain property in Walker County, Georgia, for an averred consideration of $5,500.00.

This answer and cross-bill further alleges that in March of 1955, for a consideration of $10,000 paid to Schlickling, he and his present wife, Nora Schlickling, executed to the defendant an assignment of the promissory note and a security deed, and on the same day they executed to the defendant a warranty deed conveying certain property in Hamilton County, Tennessee, which complainant then claimed to own and the consideration that by the assignment of said debt and security deed and execution of the deed to the other property, there had been a full satisfaction and payment of any and all claims which Schlickling might have had or claimed against his sister, Mrs. Fehn.

This answer and cross-bill denies every material allegation such as incompetency, senility, feeblemindedness, hallucinations, undue influence etc., with which the original bill alleged Mrs. Fehn was seized at the time she executed the deeds to it, and the cross-bill sets forth in somewhat detail what is alleged to be conferences between Mrs. Fehn and the officials of the defendant occurring at and leading up to the execution of said deeds.

In this answer and cross-bill it is alleged that the power of attorney executed May 18, 1959, named H. E. Rideout as the agent of defendant and authorized him to manage the property so conveyed to it by Mrs. Fehn,

located in the State of Georgia, and that one O. C. Churchwell was authorized to collect the rents and manage the Chattanooga property. It admits that there is in its possession a will executed by Mrs. Fehn under which the defendant is the principal beneficiary, but alleges it has no validity since the testator still lived. It also alleges that on information Mrs. Fehn executed a will to her brother in 1951, by which he is the principal beneficiary of her property.

The cross-bill alleges certain monies were transmitted from Germany by Mrs. Fehn to her said brother amounting to some $8,500 which he received and invested in certain rental properties in Chattanooga, putting the title to the properties in himself and collecting the rents therefrom, and that after Mrs. Fehn came to the United States in 1936, she, by a suit in the Chancery Court of Hamilton County, recovered the property in which the money forwarded to her brother had purchased. It further alleges that Schlickling has made a constant effort to misappropriate and dissipate the property and funds of Mrs. Fehn and that this last act of having himself appointed her conservator is the culmination of such activities on his part. The cross-bill avers that Schlickling seeks to set aside the deed to the property involved and also seeks to keep the $10,000 which was paid him by the defendant.

The prayer of the cross-bill is that the cross-defendant be required to answer the cross-bill, not under oath, and prays that in event the conveyances attacked by the bill are declared void, that Schlickling be required to pay to defendant $10,000 with interest thereon from the 10th

day of March, 1955, and that cross-complainant have a decree against him for such recovery.

While this case was pending in the lower Court many motions of different character were made by respective parties, among which is a motion to appoint a Guardian ad Litem for Mrs. Fehn, which the Court did and appointed James L. Banks such Guardian ad Litem. This attorney at the Chattanooga Bar then filed a petition with the Court, the third paragraph of which recites the following:

"The record in this cause reflects what appears to be an internecine contest over the spoils of the property of petitioner's ward between parties litigant none of whom appear to be here seeking equity with clean hands. It is the considered opinion of the petitioner that the ward needs be protected from both the complainant and the defendants and that as an officer of this Honorable Court it is his duty to so protect the ward."

This petition then makes some minute references to what had been done in the case up to its filing on October 13, 1959. The petition contains the necessary prayer for the relief sought and requests the Court for an order directing the parties to turn over all the property of his ward into the Treasury of the Court. The Court refused to comply with the prayer of the petition and set down an order considering the petition as an answer, and then later refused to grant the Guardian ad Litem an attorney to represent him, but directed the Guardian ad Litem to serve as Attorney ad Litem.

Through the record at many places where the Court ruled adversely to the motions, petitions, et cetera of the respective parties, discretionary appeals were prayed, all of which were denied until the case was finally disposed of on final decree of the Court.

Motion was seasonably made that the cause be heard on oral testimony and by a jury, and which motion was sustained by the Court and the cause was so heard, beginning on March 16, 1960.

In the course of the procedure as shown by the record, Vol. 1, page 65, the complainant conceded that if the defendant is entitled to recover on the cross-bill, it would be entitled to interest and that complainants were willing to amend the original bill to that effect. It was also conceded, during the procedure, that Schlickling was in Court both as conservator of ward's estate and as an individual.

The Court submitted to the jury for its consideration only one issue as follows:

"Was Magdelena S. Fehn senile, feeble-minded, incompetent or unduly influenced at the time of the execution of the deeds to defendant September 1, 1953?"

The jury's answer to that issue was "Yes".

That verdict did not decide the entire case of course and every question involved, and there were motions for certain findings, orders of reference made to the Master, concessions and agreements of counsel for the parties. On March 22, 1960, the Court entered the following order:

"The jury verdict having decided only part of the issues, the date for filing motion for a new trial

is extended, so that the ten days will not begin to run until an opinion is rendered or a final decree is enrolled.''

On April 26, 1960, motion for new trial was filed by the defendant. On June 7, 1960, Chancellor filed a Memorandum overruling the motion for new trial, and judgment sustaining the jury's verdict was entered; the Chancellor also found and decreed that the deeds and other documents executed to defendant by Mrs. Fehn were declared void; he found and decreed Schlickling would have to pay to the defendant $10,000 with interest thereon from March 10, 1955, to be satisfied upon the assignment and delivery by the defendant to Schlickling of a $5,500 note referred to in the pleadings. He also ordered a reference made to the Master to ascertain the amount, if any, owing by the defendant, to the estate of Magdelena S. Fehn. This reference was never complied with because of a consent decree in that respect.

It appears that the final decree from which the original defendant has appealed is as follows:

''1. That the defendant, Georgia Conference Association of Seventh-Day Adventists, be and it hereby is awarded judgment against Albert Schlickling, individually, in the sum of $10,000 with interest thereon at the rate of 6% per annum from the 10th of March, 1955, and that said defendant have and recover such sum from Albert Schlickling.

''2. That upon Albert Schlickling satisfying said judgment in the amount of $10,000 with interest thereon at the rate of 6% per annum from March 10, 1955, the defendant, Georgia Conference Associa-

tion of Seventh-Day Adventists be, and it hereby is ordered to surrender to Albert Schlickling, in his individual capacity, a certain promissory note in the original amount of $5,500.00, dated December 31, 1946, payable to the order of Albert Schlickling and executed by Magdelena Fehn, and that the defendant further surrender to the said Albert Schlickling, individually, a security deed executed to secure said indebtedness. It is further ordered that the defendant be and it hereby is required, upon the satisfaction of said judgment, to execute an assignment of said note and security deed to Albert Schlickling. The defendant will further make, execute, acknowledge and deliver a deed vesting title to the lands described in Deed Book 1173, page 583, of the Register's Office of Hamilton County, Tennessee, to Albert Schlickling and wife, Nora Schlickling.

\* \* \* \* \* \*

"ORDERED, ADJUDGED AND DECREED that the complainant have and recover for the use and benefit of Magdalena S. Fehn the said sum of $1,510.27, from the defendant Georgia Conference Association of Seventh-Day Adventists."

The cost was adjudged against the defendant, including a fee of $750.00 for the Guardian ad Litem. Exceptions to this final decree or decrees were saved, appeal prayer to the Court of Appeals of Tennessee, Eastern Section, and granted upon the condition that the defendants execute an appeal bond in the sum of $2500.00, Thirty days were allowed in which to perfect the appeal by filing bond, and by two timely orders, making in all ninety days in which to file bill of exceptions. The

appeal was perfected by filing both the bond and the bill of exceptions within the time allowed by law and the orders of the Court.

The errors assigned are succinctly as follows:

## I.

No evidence to support the verdict.

## II.

Evidence preponderates against the verdict.

## III.

Verdict contrary to weight of evidence.

## IV.

The Court erred in admitting over objection of defendant a certificate signed by Dr. Melvin W. Binger, Exhibit 1 to the testimony of the Honorable Clifford Curry, dated January 22, 1951, on the theory that Dr. Binger being dead, the certificate referred to physical and mental condition of Mrs. Fehn, could be only hearsay, having never been filed in any Court proceeding, and no opportunity for cross examination of Dr. Binger.

## V.

That the Court erred in allowing the proof of qualifications of Dr. Melvin W. Binger to be established by third party witnesses.

## VI.

That the Court erred in allowing the authenticity of the handwriting of Dr. Melvin W. Binger to be proved by lay witnesses, with no admitted genuine signature as a standard of comparison.

## VII AND VIII.

Assignments VII and VIII were abandoned.

## IX.

The Court erred in allowing complainant to prove in detail the defendant's financial transactions with Mrs. Fehn on the theory that it was proper cross examination going to the credibility of the witness and then denying defendant the opportunity to explain its financial transactions with Mrs. Fehn.

## X.

The Court erred in refusing defendant's witness, Campbell Garden, to testify with respect to negotiations he had with complainant with regard to the property in this cause, on the theory that such testimony would only show an offer of compromise and therefore inadmissible. It is said this was error since the testimony was offered to show complainant's opinion as to his sister's mental capacity only.

## XI.

The Court erred in refusing to charge defendant's special request No. 4 to the jury as follows:

"An opinion upon a matter of mere speculative belief in the realm of religion does not constitute insanity or incompetency."

This case is essentially one wherein the said Mrs. Fehn is a devout member of the Seventh-Day Adventist denomination, who are strong believers in the eventual destruction of the earth and the day of judgment. Schlickling and some of the witnesses seem to have a different opinion.

Schlickling came to this country about fifty years ago and Mrs. Fehn came to this country in 1936. They were native Germans when they came to this country, neither of whom could speak English very well and Mrs. Fehn never learned to speak English fluently. Schlickling became a naturalized citizen of this country in 1921 and Mrs. Fehn was naturalized in 1946 or thereabout. Prior to Mrs. Fehn coming to this country she had sent to Schlickling some $8500.00, which he had invested in property in Chattanooga and when she came to this country she had not been repaid, so that there was litigation between her and her brother and this property was recovered for her. Schlickling and his first wife had matrimonial trouble and Mrs. Fehn was a party in that lawsuit. Thereafter the first Mrs. Schlickling brought suit against Mrs. Fehn charging her with alienation of affection of her husband, and that suit was litigated. It is perhaps in the litigation involving Schlickling and his wife's litigation that Mrs. Fehn recovered her property. Evidently Schlickling was divorced from his first wife and later married again.

In about 1947 or '48 Mrs. Fehn united with the Seventh-Day Adventists Church. Schlickling testified that she tried to induce him to join that church and that she was constantly telling him that the "world would come to an end." In other words, that the judgment day was coming and that she was much interested in getting her brother and others to join that denomination. He has seen many pamphlets that she had from the defendant. These pamphlets were printed in German. She could read some English but very little.

One day in 1953 Schlickling was called out to the home of his sister where he found some members and

a minister of the defendant and was there informed by his sister that she was going to turn over all of her property to the church. He related that she was disturbed and he quoted her as saying, "I am ready to sign everything over to the church because the world is coming to an end". He said he told the men present, as well as his sister, that if she was going to turn over her property to them they would have to take care of her, and that they responded in the affirmative, saying: "We do". He said he spoke to his sister in German and that she was greatly disturbed. This witness was permitted to say that he believed his sister was feeble-minded and he was asked to relate what she did or what she said that so indicated to him that she was in that condition. His answer to that question:

"A—Well, whenever she would talk to me she didn't—she talked kind of foolish, so to speak, you know, and always came up with this here, 'The world is coming to an end and you better do something', 'You better get ready, the world is coming to an end and you had better get your friends together and get a minister'."

Mrs. Fehn had been treated by Dr. Binger, who was a staff member at Campbell's Clinic. Dr. Binger could speak German and converse with her in that language. Schlickling stated that his sister was not able to testify in the case which his former wife had brought against her, and that there was some evidence of her incapacity shown by doctor's certificate.

Mrs. Fehn had a lawsuit in Georgia sometime prior to the execution of that deed to the defendant. Schlickling claims that he had paid out some money for her

and then he got her to execute a security deed for $5500.00 to him evidenced by promissory note. Thereafter this $5500.00 promissory note was conveyed to the church, that is, the defendant, and some other property that Schlickling owned, was conveyed to the church all for the consideration of $10,000. The property that Schlickling conveyed to the church was located in Chattanooga.

Schlickling testified that after the meeting he had in her home when she conveyed the property to the defendant, he want back to the home soon thereafter, found the door locked, and understood that she had been turned against him and that he did not go back or call on his sister until the Spring of 1959. At that time he learned that his sister was in desperate condition and filed his bill and was appointed conservator for her property on June 22, 1959. The neighbors were the ones that told him about her condition, who had been bringing her breakfast. He states that thereafter he furnished her food, had her premises cleaned up, furnished her maid service and also nurse service. On Friday before the hearing Mrs. Fehn fell and broke her hip.

The property, or a part of it, involved in this suit is the same property that Mrs. Fehn recovered from her brother when she came over here from Germany, where he had purchased it with her money. The witness gave as a basis for his statement that Mrs. Fehn was incompetent when these deeds were executed, is that she believed the world was coming to an end and that she had that on her mind constantly. He evaded the questions that were being asked him continually. Objection after objection was made, finally the Court said:

"THE COURT: Mr. Moon, you know what the rule is, answer the question, then make explanation afterwards. This witness is just going all around in a circle and never has answered the question but is undertaking to make his explanation without answering the question first.

"Now, Mr. Schlickling, when a question is put to you answer the question, please, sir, and then make your explanation afterwards."

The stenographer then read the question to him which was whether or not he believed a person who thought that the world would be coming to an end or who believed that the world would be coming to an end was insane, his answer was, "I do believe that".

On cross examination the witness admitted that he had not been back to see his sister except on an occasion or two when he found the door locked in 1953 until 1959. Then when he went out there in 1959 and found the house dirty and his sister neglected, that he began having the things cleaned up and furnishing her food and that he filed his petition and had himself appointed conservator. He then stated that he did not file any lawsuit until after Mr. Churchwell had brought a Power of Attorney and had her to sign, then he brought the suit.

This witness with the exception of what he says was the condition of his sister when he returned to her home in 1959 after having had nothing to do with her since 1953, is simply that because she was a believer in the doctrine of final judgment and destruction of the world as taught by the Seventh-Day Adventists, she was not competent to execute the deeds under attack in 1953.

He had been called to her home at that very deed execution. He admits he explained to her, speaking in German, what that would mean. He admits that he had but little conversation with the persons who were there with him, and there is no basis or predicate laid by him that justifies, or from which the jury could infer, that she was either mentally incompetent or was unduly influenced so that she did not understand the result of her acts or that her acts were that of another and not of her own, at the time the deeds were executed.

The next witness, Mrs. Jessie Teppenpaw for the complainant, was asked many incompetent questions by counsel for complainant. The Court continued to sustain objections constantly, stating to counsel that he would have to lay a predicate before he could ask whether or not Mrs. Fehn was rational or irrational during 1953 and prior thereto. She was asked such questions as these:

"Q—In these conversations state whether or not she appeared rational or irrational."

That would be objected to and the Court would say:

"THE COURT: The Court will sustain that objection until you show the circumstances or conversations or something that took place upon which an opinion could be formed."

And after argument with the Court, he finally overruled the objection, letting the witness answer the question and the following is some of the things she would say in answer to the question:

"A—Well, I don't hardly know what to say there * * * well I don't hardly—she talked with me and

then she was all right she would just forget you know, she just seemed that way, she didn't—"

And after she was asked many more questions the Court then said:

"THE COURT: The Court understands she just did not qualify, she still hasn't qualified as a lay witness to express an opinion with regard to the mental capacity of Mrs. Fehn in 1953."

Counsel would, in spite of the ruling of the Court and his instructions, continue to ask questions that were not competent. She was finally asked this question:

"Q—From your observation state whether or not she was capable, in your opinion, of signing any legal instrument?"

She answered, "No, sir, she absolutely was not".

"Q—Now, what do you base that upon?

"A—Well, her age and I don't know what else could be bothering her, but she was harmless, but I don't know, forgetting, she would do things and not know about it.

"Q—What things do you know of her doing that she forgot about?

"A—Well, signing some papers and deeding her property out because she told me she didn't do it and she wanted to get a lawyer and help straighten it out and I told her I couldn't do that, that she would have to have her brother. She said, well, she didn't know about that, whether he would or would not, and she asked me would I call him and I said, 'Yes, I would,' and I did."

The witness' testimony all through direct examination is completely devoid of any predicate from which to express an opinion and clearly shows that the opinion she did express with reference to Mrs. Fehn's mental condition, did not have any application to the year 1953, but was much later.

We think her testimony meant nothing so far as forming a predicate on which an intelligent opinion of mental incapacity could be competent, as related to the date of the execution of the involved deeds.

On cross examination she said in 1953 Mrs. Fehn kept her house in good condition; it was clean and well kept.

One O. C. Churchwell who had collected rents for Mrs. Fehn beginning back about 1938 was examined. He saw her between the 10th and 15th of each month, collected rents for her, gave her that part of the money that she instructed him to give her, but on cross examination he stated that prior to 1952 he collected the rents and turned it over to Mr. Schlickling. This witness was continually improperly led by counsel for complainant. The only real statement that he made with respect to her mental condition was simply that sometimes he would be talking to her and telling her things and by the time he left she would forget. He could not speak German. She only talked to him in German and he made the statement that he observed that her memory began to fail "I'd say in '53".

He said that after 1952 and until May of 1959, that is during that six year period, he paid her the rents and she executed to him receipts. He said that he had a letter from Mr. Rideout in 1954 in which he was informed that Mrs. Fehn, in a conference with Mr. Rideout, had

agreed that the rent on the house he occupied should be raised to $40.00 a month; that he took the letter down to her and made this statement:

"When I took that letter down there with me and talked to Mrs. Fehn about it she said, 'Well, the church people was going to take care of her property and that she didn't know nothing about that.' Said they was taking care of it, so there wasn't much I could do about it as long as they had it."

He then said he continued to pay $40.00 a month rent deducting 10% for collecting the same as he did on the other houses which belonged to her, the rent for which he collected.

This witness gave no sort of substantial evidence of any mental incompetency of Mrs. Fehn in 1953, and as we understand it, no predicate was laid which would justify an inference of incompetency.

Mrs. Churchwell, wife of the witness who had collected the rents, said that she had been going with her husband to Mrs. Fehn's periodically when he would pay her the rent and that they began to pay her the rent which he had been collecting, in 1953. Prior to that time he had paid most of the rent to Mr. Schlickling, but from 1953 until 1959 the money was paid to Mrs. Fehn. This witness talked about seeing the brother there during the period of time when he himself had testified he didn't go about his sister nor her home nor have anything to do with her. She finally admitted that she could not give any definite year when she had seen Mr. Schlickling out there.

Charlie Teppenpaw, husband of a former witness, was asked about his association with Mrs. Fehn. He could not speak German; he said he saw her right frequently from 1950 up until about 1956 or '57, when a Mrs. Fisher was hired to do her work. He related how that she would get him to pay her bills and sometimes she would forget that he had paid them and would want him to go pay them again. He also said that she would get things lost around the house and she would think somebody had stolen them. He said she was forgetful and on one occasion brought an alarm clock up to his home to get him to carry it and have it repaired and she forgot it was up there and thought somebody had stolen it. He made the following statement in response to a direct question about her mental condition:

"Well, I don't think that Mrs. Fehn was capable of looking after her own business at her age and all because she was so forgetful and all, and she misplaced everything, she missed her money, she missed everything around the house, she would come up there to our house all of the time and claiming somebody had broke in her house or stolen something. * * * And in that way I don't think, from the conversation with her and all, I don't think that Mrs. Fehn was really competent to look after any kind of business of her own."

He was then asked about when these things occurred in an effort to fix the time, when the following questions and answers were asked and given:

"Q—I am asking you for an approximate date.

"A—And I am telling you I don't know the approximate date.

"Q—You don't even know what year it was, do you?

"A—No, sir."

This witness said he could not understand German, but that he could understand some of the things that she said and he was asked and answered:

"Q—How many times did you see her in the month of September, 1953?

"A—I couldn't tell you, Partner. You have asked that same question forty times and I have told you that I didn't keep no track."

He finally said:

"I wouldn't say it was 1953 or '54 or '55, been a visitor in our home ever since she lived down there, we have looked after her."

He explained that the reason she would come and talk to his wife about business was that the people she would call on the telephone couldn't understand her.

Professor Robert H. Anacker, who was referred to in the questions as "Doctor" and who taught German at the University of Chattanooga, testified that he was interpreter in the case in 1951 wherein they had taken a deposition of Mrs. Fehn; that his use there was "to put questions to Mrs. Fehn and translate her answers back", and that this occurred in the office of Mr. Coffey in the Volunteer Building in Chattanooga. The witness claimed that he spoke perfect German but when he would ask her a question or interpret a question to her, he explained:

"I have already stated that I couldn't get a straight answer to any question."

He was asked and answered:

"Q—Now as a result of your conversation with her that day and your attempt to ask her these questions and get an answer from her, what is your opinion as to her mental capacity at that time?

"A—Well, inasmuch as I have had experience to go by I would say that certainly on that day she was in no condition to understand what was going on."

The witness said he had not talked with Mrs. Fehn since that occasion in 1951. He was asked:

"Q—Have you conversed or talked with her since?

"A—No."

On cross examination he stated that a well educated person would have trouble in a conversation with illiterate "German Bavarian" during that conversation, and in his explanation of his observation of Mrs. Fehn, on cross examination he was asked:

"Q—Well, what was the problem?

"A—The problem was her lack of understanding, her lack of awareness, let's say, or cooperation. There was no answer, no sensible answer given to anything."

One Robert E. Robinson, a resident of Rossville, Georgia, and a fire insurance agent said he had carried insurance on Mrs. Fehn's property since about 1946, and had called on her once or twice each year from 1947 until probably 1951. This witness said he was a prisoner of

war in Germany in 1942 and that he would discuss with Mrs. Fehn villages and towns and would talk to her about the furniture she had in her home and where she had gotten it, and that in October 1953 he called on her and she did not seem to recognize him. His conclusions were:

"A—Well, I felt that she, since she didn't recognize me that she was—she just didn't really seem to be herself like she had in the past."

The next witness in behalf of complainant was a Mr. George Fillauer, who had known Mrs. Fehn since she came to this country in 1936. This witness is a retired pharmacist. He said that during the years '50, '51, '52 and '53 he would see her at intervals which he judged to be frequency of three months. He would see her generally with his wife and that conversations were with his wife. He could not relate any particular conversation he had ever had with her. He responded to questions in this manner:

"Well, as I stated, my conversation with her was limited and not having participated in the conversation but in overhearing her conversation with Mrs. Fillauer I just considered that her mental state was rather impaired, that her conversation was irrational."

He said that she had passed him some literature of the Seventh Day Adventists church and upon the basis that she had given him that literature he said: "I deduct that it was her belief". With reference to how she was dressed, he said: "Well, she appeared not to be very careful about her dressing and clothes." and then he

was asked about any particular action he had ever noticed and said: "I don't recall any particular action".

On redirect examination this witness was asked:

"Q—Judging from her action when you saw her in 1953, her actions, her conversation, her appearance and so forth in your opinion was she capable of transacting any business transaction?

"A—I am not a psychiatrist, but for my lateness in life shadows observation of human behavior, I think she was not."

We are unable to see any predicate laid by this witness from which we could possibly determine that Mrs. Fehn did not understand the result of her acts when she executed these deeds in question, at the time executed.

At the conclusion of this witness' testimony the Court said:

"THE COURT: This makes six witnesses that the complainant has had now, law witnesses, with regard to the question of the ability or the mentality of Mrs. Fehn. I believe that is sufficient on that score, and I will hold the defendant to the same number, six lay witnesses."

Following that statement there was a considerable argument between the Court and counsel for Mrs. Fehn, whereupon the Court agreed to the introduction of one additional witness, Mrs. George Fillauer, wife of the former witness. This witness stated that she had known Mrs. Fehn a good many years back to about 1940; that she visited Mrs. Fehn in 1950 and noticed she was talk-

ing quite a bit about the church. Mrs. Fehn would talk to this witness about the judgment day, end of time etc. and the witness described her conversations with her, as they would discuss matters in German as "very irrational and she just talked a whole lot of nonsense, I never could get any decent conversation out of her." She described her conversation as:

"* * * And all stuff like that. Then she talked about her religion and then she started talking about people coming to see her and wanted to poison her and they are all against her and everybody come in the house stealing from her."

Her statement is: "She was unbalanced, definitely". She explained her situation in 1951 and '52 as being "sick", and said "I call it, she was actually sick". She was asked and answered:

"Q—What appearance during that time did she have?

"A—Well, scared and off balanced most of the time. She started a conversation and couldn't carry it on at all. You talk about one thing and she started to talk about something else, but mostly she thought everybody that come to see her wanted to steal from her, wanted to poison her. That's the conversation she had with me most of the time until I talked German to her and explained to her that she musn't fear, that nobody wanted to do her any harm."

The witness then was not able to fix the things that she had related to the year 1953 and finally in a sort of leading question she was asked about this year '53 and what Mrs. Fehn's condition was and she explained it in this way:

"A—Well, truthfully saying, you couldn't carry on a conversation with her. She either wanted to talk about Jehovah—"

And the witness said she asked Mrs. Fehn, "Mrs. Fehn, do you know the world is coming to an end?" and Mrs. Fehn answered: "I know it better than you do."

This witness was asked if she remembered when Mrs. Fehn and her brother had dissolved friendship and the witness said: "I felt sorry for her because she had very few friends after she broke up with her brother." She was asked about Mrs. Fehn's frugality and said: "I would say she was a little tight."

On cross examination she admitted in 1953 that she and her husband left for Europe in May of '53 and did not return until October or November of '53 and that she did not see Mrs. Fehn until about November 1, '53.

When analyzed for all it is worth this witness did not agree with Mrs. Fehn's religious convictions and thought they were foolish and nonsensical, she was asked and answered:

"Q—Well Mrs. Fillauer, isn't it a fact that most religions believe that at some time or another this world, as we know it, is coming to an end?

"A—Well my religion doesn't.

"Q—Well, of course, I merely asked you the question, don't most religions?

"A—You said most', I don't know about others."

If there is a witness in the record that gave an predicate upon which an opinion of the incompetency of Mrs.

Fehn to understand the nature of her transaction with respect to executing deeds in September 1953, it was this witness. In analyzing her testimony, however, we must remember that she didn't see Mrs. Fehn from May until November of 1953.

She detailed an occasion which she said occurred in 1952 when the witness and her husband gave Mrs. Fehn a bottle of wine and after drinking it, or at least some of it, Mrs. Fehn started to get on a street car and fell. The witness said the next time she saw Mrs. Fehn she asked her why she fell and that Mrs. Fehn said: "Oh, my brother gave me that wine, he tried to poison me". The witness, however, in explaining what activity was had when she gave her the wine, said, "the wine was all right but that Mrs. Fehn probably drank it on an empty stomach and it made her sick."

This witness was asked about the lawsuit Mrs. Fehn had with her brother and the witness explained she understood it to be a friendly lawsuit. That suit will be referred to herein later.

A most serious question in this case developed with the introduction of the now Chancellor Clifford Curry, who was introduced and who testified that he represented Mr. Schlickling in the 1940's, and that he represented Mrs. Fehn in the case wherein she had been sued for the alienation of the affection of her brother by her brother's first wife, Martha, in 1951.

When the learned Chancellor had informed counsel that he was going to let them introduce only six witnesses on the mental capacity of Mrs. Fehn, an argument followed in which Mr. Moon, counsel for complainant,

stated that they had a doctor's certificate that they proposed to introduce. His exact statement and the statement of the Court are as follows:

"MR. MOON: We haven't even introduced this doctor's certificate. We want to introduce that.

"THE COURT: The Court will allow you to introduce the certificate. That's not a lay witness, that's an expert."

We have already stated that the Court did allow complainants to introduce one or two other witnesses, and when Chancellor Curry was offered the question was made by counsel for defendant that his evidence would be an accumulation of the evidence of the other witnesses, the number of which had been limited by the Chancellor, but counsel for complainant reminded the Court that they had previously called the Court's attention to the fact that they wanted to introduce this certificate and what the Court said is set out above, and informed the Court that Chancellor Curry was the one who had custody of that certificate. This dialogue followed:

"THE COURT: (Interposing) The Court is going to allow you to introduce the certificate.

"MR. MOON: This is the witness who has the custody of that.

"THE COURT: You may proceed to introduce the certificate.

"That is a record, a professional record?

"THE WITNESS: Not the record, but May I explain why it was I procured a certificate?

"THE COURT: If the certificate is in the record. The Court has ruled the certificate may be introduced in this record as professional testimony or testimony of the deceased doctor and not to be treated as a lay witness.

"MR. HALLADAY: And as I understand your Honor's ruling, it is contingent that it is in the record of this former proceeding.

"MR. MOON: The record of this attorney.

"MR. HALLADAY: Oh, no, your Honor, no, sir. That would be hearsay unless it is a part of the record of that proceeding.

"THE COURT: The Court's understanding is that this was a record in some legal proceeding.

"MR. MOON: It was obtained, as I understand it, for the purpose of this legal proceeding, to-wit, the suit for alienation of affection, which was tried in January of 1951. Doctor Anacker has told us he was the interpreter at a taking of a deposition on, I think the 18th of January.

"MR. HALLADAY: Your Honor, I object.

"MR. MOON: The date of this certificate—

"MR. HALLADAY: (Interposing) Mr. Moon is testifying.

"THE COURT: Just a minute. Let Mr. Moon have an opportunity to tell the Court.

"MR. MOON: I am not attempting to testify, I am attempting to relate what Doctor Anacker said.

"MR. HALLADAY: The Court knows that Mr. Anacker said.

"MR. MOON: If you think I am mistaken, please tell me because I am not trying to say anything that Doctor Anacker didn't say.

"THE COURT: Address yourself to the Court and not to Mr. Halladay.

"MR. MOON: I understood that Doctor Anacker has testified that he acted as an interpreter at a deposition taken in Mr. Coffey's office in January, 1951. The date of this certificate is January the 22nd of 1951, and is a relationship between those two events. I am trying to tie them together by asking this man at a time when he was an attorney, if he took this deposition, the result, why he got the certificate, where it is now and why it is there now.

"MR. HALLADAY: If the Court please—

"THE COURT: (Interposing) Was that certificate ever filed in any proceeding?

"MR. MOON: I do not understand that it was filed, no, sir. My understanding is based on conversations with the witness. * * *"

This running battle between counsel and the Court, sometimes with the witness interrupting, and the Court permitted the introduction of the certificate. In addition to the two and one-half pages above set out, argument continued over about ten additional pages of the record, all in front of the jury and before any cross examination was begun.

On cross examination an additional two and one-half pages of this discussion between counsel, the Court and witness all took place in the presence of the jury.

The doctor's certificate was permitted to be introduced by Chancellor Curry, never having been filed in a court of record, and is as follows:

Comp. Ex. 1 Cliff Curry)

"MELVIN W. BINGER, M.D.
"Internal Medicine

"Office 525 McCallie Avenue, Phone 7-4515
"Residence Hogshead Apartments, Phone 7-5725
"Earl Campbell Clinic
CHATTANOOGA, TENNESSEE
"Reg. No. 373

"For Mrs. Martin Fehn
"Address, 607 O'Neal St.

"The above patient has been under my care for over 2 yrs. She has high blood pressure and cerebral arteriosclerosis. This effects her mental activity & memory adversely. Tension & excitement makes her condition worse. It is inadvisable for her to appear in court.

"/s/ M. W. Binger, M.D. 1-22-51."

Complainants introduced one William Bobo, Assistant vice-president American National Bank, in which bank he testified that Dr. Binger, the person whose signature appears on the above certificate, kept an account in the bank and that there had been filed with the bank a signature card of Dr. Binger. Objection after objection was offered to the testimony of this witness and

much controversy between the Court and lawyers during the time he was on the stand, but the witness had no recollection of ever seeing Dr. Binger sign his name. He had never seen any other writing of Dr. Binger, but he was permitted by the Court to take the signature card that had been filed with the bank and which he said he did not see Dr. Binger sign and after stating that he was not an expert, he was permitted to take that signature card, compare it with the certificate bearing Dr. Binger's name and to testify that in his opinion the same party made both signatures and was asked and answered:

"Q—State, if you will, what the comparison is.

"A—Well, I think the characteristics are similar, all of the signatures, in my opinion, it's the same signature, that's all I could say."

When he was shown that signature card he was asked:

"Q—Do you have a genuine signature of Dr. Binger in your hand?"

Much argument followed between counsel and Court on the objection being made by counsel for defendant on the theory he didn't see it signed and didn't know whose it was, but the Court overruled the objection and then without an answer this question was asked:

"Q—Mr. Bobo, knowing that the one signature card that you have there contains the genuine signature—"

At that point objection was made by Mr. Halladay to this counsel's statement as made in the question, whereupon the Court said: "Proceed". But before the question was answered again Mr. Moon said:

"Q—Mr. Bobo, knowing that the signature card you have in your hand contains the genuine signature of Dr. Binger, have you compared it with the signature appearing on that of complainant's Exhibit 1?

"A—Yes, I have compared it.

"Q—State, if you will, what the comparison is?"

And with that the signature card was filed without further identification of Dr. Binger's signature.

The Court permitted examination of Dr. Guy M. Francis, Vice Chairman of Campbell's Clinic with which he testified Dr. Binger was associated and was permitted to state that Dr. Binger was an employee of Campbell's Clinic, and after stating that the record which they had of Dr. Binger had been turned over to the family at the time of his death, which showed Dr. Binger's qualifications, he was asked and answered:

"Q—Yes, sir. What were the qualifications of Dr. Binger?

Objection was made and without an answer he was then asked:

"Q—Dr. Francis, I will ask you if the profession that you and Dr. Binger practiced maintains a service of listing the members of the profession and their qualifications?

"A—Yes.

"Q—What are those works known as?

"A—Well, one is The Directory of Medical Specialists, and the others which I have with me this morning was an account of Dr. Binger's death in

the journal of the American Medical Association, 1952.

"Q—Dr. Francis, state whether or not those publications are recognized by your profession as what you have described?

"A—Yes, they are recognized.

"Q—I will ask you whether or not they are regarded by your profession as source material with which to verify the qualifications of a strange doctor?"

Objection was made and the Court immediately overruled it, the question exactly in the same form reasked.

"A—Yes.

"Q—Do you have those two works?

"A—I have those two works.

"Q—Are they a part of the archives of the Hamilton County-Chattanooga Medical Association?

"A—Yes.

"Q—Are you a member of that Association?

"A—Yes, sir.

"Q—Are they maintained at the Chattanooga Public Library in the Medical Division by that association?

"A—Yes, sir.

"Q—Have you, as a member of that association, withdrawn them for the purpose of coming to court?

"A—Yes.

"Q—Will you now give us the qualifications of Dr. Binger?"

Objection was interposed, and the Court said after argument:

"THE COURT: Mr. Moon, if you have any source material that was relied upon which Campbell's Clinic, in the rentention and hiring of Dr. Binger, that may be introduced, but if it is material that was not used in connection with his employment it would not be competent."

Argument followed in which the Court finally sustained the objection, saying again:

"THE COURT: If it is source material that was used in connection with his employment it may be introduced."

The witness then said that he could not say that they went to this book and looked up to see if what Dr. Binger told them was true, and then said:

"A—* * * We know he came from the Mayo Clinic, or at least he said he came from the Mayo Clinic and other—"

Objection again made and after argument, the Court said:

"THE COURT: I am going to let this Doctor testify of his own knowledge concerning the qualifications that he observed Dr. Binger to have".

The witness answered:

"A—I am not sure I understand what you want. You mean as far as his ability as being a physician?

"Q—Yes, sir.

"A—Well, as far as I am concerned he was one of the hardest working and the most intelligent physicians that I have ever come in contact with and I have nothing but praise for his medical ability."

This witness was then permitted, over objection, to state what the general practice of Dr. Binger was and to analyze the work which he referred to as that of a "diagnostic" and was permitted to say:

"A—Well, as far as I was concerned from my personal contact with him, he was very good at that."

He testified that Dr. Binger died in 1952. This witness was also permitted to say that he had seen the signatures of Dr. Binger but that he could not say that he could identify Dr. Binger's signature on any record unless he had another one with which to compare it. He was then asked:

"Q—I hand you herewith what purports to be a signature card for Dr. Binger's dealings with the American National Bank and Trust Company."

There was then much argument and objection by counsel to that question and the Court said:

"THE COURT: I am going to let the Doctor answer the question."

Thereupon the answer was:

"A—This looks like the way I remember his signature."

All of the foregoing testimony of Chancellor Curry and of Dr. Francis, together with the many objections, statements of counsel and directions of the Court were in the presence of the jury. The reference to argument of counsel as shown in the examination of Chancellor Curry is indicative of the argument between counsel and Court that was carried on from almost the moment this trial began until it closed.

At conclusion of complainant's evidence in chief, and before the evidence of Dr. Francis and Mr. Bobo was offered by complainants, motion was made by counsel for defendant to withdraw case from jury and decree in favor of defendant. The motion was overruled by the Court, and defendants introduced proof.

The first witness for the defendant was Mr. Jack Hinds, who at the time he testified, lived in Florida, but had lived in Chattanooga for some time and was employed by the First Trust Company in the Title Loan Department. He was the notary public that took the acknowledgment of Mrs. Fehn to the deeds in question. He went out to Mrs. Fehn's home with Mr. Rideout and when he arrived at the home Mr. Ross Arnold and Mr. Kungel were there. He had not met Mrs. Fehn before. He was introduced to her. He said she spoke German and that he could not understand everything she said. He said Mr. Kungel spoke German and that he took each of the deeds and as he sat there by the side of Mrs. Fehn he ran his finger along each line of the written deeds and he understood that he was translating those deeds to Mrs. Fehn in the German language. As he ran his finger over the lines and words and talked to Mrs. Fehn, that Mrs. Fehn would say, "Yeah" and nod her head in an affirmative way so that he understood that

she was agreeing with the statements contained in the deeds as translated to her by Mr. Kungel and after the deeds had been so gone over with her in his presence she then signed each one of the deeds and he, in taking the acknowledgment, asked the usual questions and she would say "Yeah" or bow or nod her head in the affirmative. He said he stayed there in the house with the group for about 45 minutes and that he remembered Mr. Kungel and Mrs. Fehn were talking about the cuckoo clock she had there and that he understood Mr. Kungel to tell her he wanted it when she got through with it and that he was sort of teasing her in a way about the cuckoo clock.

This witness said he noticed her dress and the appearance of her home, his statement is that, "the house struck my fancy because a little old fashioned and very neat". He stated that Mrs. Fehn was dressed in a normal way and was clean. He was asked and answered:

"Q—Mr. Hinds, I understand that you do not understand the German language, but based upon your observation of her, her actions, her mannerisms, the manner in which she spoke, would you state that she was competent or not to execute this deed?

This was objected to but overruled.

"A—Well, she didn't appear to act strange or anything because if she had I would never have notarized the paper.

"Q—State what you saw and heard out there, Mr. Hinds, to the best of your ability?

"A—Well, to me it was just strictly a business matter, and Mr. Kungel was joking with the lady,

apparently, you can tell when somebody is joking or talking business, and it was just a matter of getting the papers signed after it looked like they were explained to her, and I notarized her signature because had there been any duress or any force used, I would have turned around and walked out.''

This witness had refused to talk to Mr. Moon about the case and on cross examination was asked why. The witness explained that he was put out for having to come from Florida at this particular time; it was the season when he was missing the best week of business, being a salesman in that territory; that he had discussed the matter with Mr. Halladay and told him all that he knew and said:

''* * * I was a little bit fed up and put out and I didn't feel like I wanted to talk to anybody.

''Q—You don't have anything to hide about this, do you?

''A—I definitely do not. Go ahead and ask me all the questions you like.''

Counsel then asked many questions about the bond of notaries, what a notary was and many questions that had no bearing whatsoever upon the issues involved, but the witness answered them with patience and in an intelligent way. The witness said he was 30 years old and that he was in the military service 33 months.

On cross examination he said that after he had observed the conversation and the method of explaining the deeds to Mrs. Fehn and her actions, that Mr. Kungel turned to him and said, ''She understands it''. With respect

to her signing he said, "And then she took great pains in placing her signature on there, writing a little bit slow." He says to the best of his recollection that he asked Mr. Kungel to read the deeds to her because he, himself, did not speak German. His summary of the whole situation was in answer to the question on cross examination with respect to whether he asked her if she executed the instrument for the purposes therein contained etc. and he answered:

"A—Now we are going back quite a distance back in the future (meaning past). Now, I have been saying this might have happened, this may have happened, and it may have happened that she told me that she understood exactly what was happening. I just don't recall because I know she could speak some in broken English, very little. Now, it may have been possible that she told me she understood but I do not recall it."

He identified the deeds as the ones on which he had taken acknowledgments as a notary.

In this Opinion it seems proper to state at this point when Mr. Hinds, the notary public, and Mr. Rideout arrived at the home of Mrs. Fehn the day these deeds were acknowledged, Mr. Kungel, who could speak German, and the attorney Mr. Ross Arnold were present. The proof is positive and without contradiction that on that occasion, Mrs. Fehn and Mr. Kungel were in conversation and Mrs. Fehn wrote two longhand pages in German language with pencil, which are filed as Exhibit 8 to Mr. Kungel's testimony. The original appears in the record and Mr. Kungel, while testifying, translated this document as follows:

"I had an apartment house in Schnappach by some Saint Street there. I built it and I—the house stood on a coal mine. Then I sold the house to coal miners and then I put the money in the bank and send it to American to my brother, Albert Schlickling to Chattanooga. I send it to Chattanooga January, 1929 and he built with the money four houses on O'Neal Street and he rented them out for $25.00 and each one and later $35.00.

"In 1936 I came to Chattanooga and I worked in the Rathskellar from morning until night without pay and in 1938 I was married to Mr. Fehn. He had seventeen houses in Oglethorpe. Two burned down in 1942. Two burned down. In 1942 Mr. Fehn died and in 1949 I moved to Chattanooga around Christmas and Albert collected a hundred and sixty dollars rent but he only give me $60.00 and he was supposed to fix up the houses with the hundred dollars and pay the taxes, but it wasn't done. Then I paid the taxes in February, 1953, I paid $242.00. Since the 15th of February, 1953, Mr. Churchwell collected the rent in Oglethorpe and Mr. Gates collected the rent in Chattanooga. Now I become the rent. Since February 1953 twice I sign some kind of a paper. I felt like I was hypnotized and I did not know what I wrote because I had not read the written writing before I signed it." R. pp. 736-737.

Mr. Kungel said he did that translation while testifying the first day and that he made two mistakes. Where he had translated "By some Saint Street" should be by "St. Ingbert Street", and that "February" in the headline should be "January".

He also said that he typed what he remembered to be the substance of the conversations which he had had with Mrs. Fehn, including that the day the deeds were executed. He was requested to and did file that as Exhibit 9 to his testimony and it is as follows:

"Experiences of Mrs. Fehn as told to E. E. Kungel Tuesday Sept. 1, 1953. Before I came to America I owned an apartment house in germany it was located on a coal mine and became valuable property I sold it and it was removed. The money was put in the bank I had the bank sent it to Albert Schlickling in Chattanooga in 1929. He built four houses and rented them out for $25. each and later $35.00

"In 1936 I came to Chattanooga I worked in Alberts Cafe for some time for my board and room. In 1938 I married Mr. Fehn. He had 17 houses in Ogalthrope two burned down about 1943.

"In 1942 Mr. Fehn died I moved to Chattanooga in 1949 Xmas There was some law suit by one of the Fehn Children but they lost in court. About 1956 Albert stated to take charge of the houses in Ogalthorpe also and collected the rent $160. a month on the houses. He hired a Mr. Gradzer to collect the rent and turned it over to him to maintain the houses from 1938 to 1945. Albert collected the rent since the trail in 1945 or 46 $160. a month and he gave me $60. for living expenses. Mr. Gratzer was suppose to pay the court charges out of the rent he collected. Albert was to pay taxes and maintain the houses but they dont show any maintenance. January 1953 I paid $242.00 taxes.

"Since February 1953 Mr. churchwell in Ogalthrope collects the rent and F. L. Gates Chattanooga collects the rent here. Up until then Albert collected it all. I let him collect it all these years because I considered him like my own son. He has had charge of them since 1932 and I dont know what he did with all the money. Since February I signed some kind of a paper twice it could have been some Martgage of deed I I felt like I was Hypmotized I did not know for a while what I was doing but wept after they were gone wondering what I had done. I am now repairing the houses and painting since I get the rent money since February 1953. I collect .$160 at Ft. Ogalthrope and $85.00 here I deposit it in the Hamilton national bank, Hylandpark Branch. I want to save some for the church and fix the houses so they are in good shape."

At this point it should be stated that the witness for the complainant, Dr. Anacker was asked to take Exhibit 8 written by Mrs. Fehn in German hereinabove referred to, and give his translation of it, which he did in rebuttal, and that is shown in the record, but there is no material difference between the two translations.

Mrs. Martha Schlickling, former wife of Mr. Schlickling, testified that she was familiar with the fact that Mrs. Fehn had sent Mr. Schlickling $8500.00 and that when Mrs. Fehn came to the United States in 1936 she came on a two year visa and came to collect her money. She said Mrs. Fehn demanded that money and that she, the then wife, requested him to pay his sister and let her go on back home and he replied, "It will never happen."

Rev. Robert E. Crawford, a minister of the Seventh Day Adventists faith and the Secretary of the Georgia Conference Association of Seventh Day Adventists beginning in January about 1954. As such official he had charge of some of the records in the Conference office. He had a conversation with Mrs. Fehn in 1955, having met her in her home in the presence of Mr. Jeskie, who could speak German. The witness could not understand all she said but could understand some of the things that she said in very broken English. He detailed how he and Mr. Carden met Mr. Schlickling in the bank and went over the discussion of the debt which he claimed to have against the Georgia property involved and that there in the bank it was arranged to take up the debt which Mr. Schlickling claimed his sister, Mrs. Fehn, owed him, and transferred his property rights securing same, together with a small piece of real estate, all for the consideration of $10,000. He saw Mrs. Fehn again during the next year. He described her as being very jovial; that she would carry on her part of the conversation, most of which he said was about Europe, and that she told him about the property she owned in Germany at the time she lived there and how it was that there had been a mine under it and things of that kind. He said that while he was in her home she served him with cookies and lemonade and that she was very clean and very nice. He saw her again in 1959 and it was evident that she was becoming feeble; that he talked to her about getting someone to live with her in her home or getting her into an approved nursing home and that generally her reply would be to the effect that, "No, I had rather stay right here". On cross examination this witness said she had mentioned about sending this money

to her brother; that he talked to him about it and their statements as related to amount "Tallied". He explained his visits to her home in a very reasonable and sensible way and gave his testimony very direct.

Rev. A. C. McKee, at the time of the testimony in 1959, was the President of the defendant. Prior to that he was Secretary-Treasurer of same, he is an ordained minister. Came to the Georgia Conference in 1955. He first met Mrs. Fehn in September 1958 in company with one Mr. Fred Meister, Mr. and Mrs. Rideout and R. E. Crawford. Their business was to see if they could be of some assistance to Mrs. Fehn. They were only in the living room of her home for about two hours. Her home was reasonably neat as might be expected of a lady her age and living alone, clean and tidy, so was her personal appearance. The question of whether she would like to have someone living with her in the home or to live in an accredited home near Chattanooga was discussed and the possibility was explored of getting a lady who spoke German to live with her. He states that she hesitated to express any desire to leave home, but did discuss both of the situations. She said she missed items from her home from time to time and would welcome some association and companionship.

On cross examination he was asked many questions about the account of Mrs. Fehn, kept by the defendant, particularly credit of $2000.00 as of March 31, 1955, and a $2000.00 check of same date, Exhibit 3 to the testimony of H. E. Rideout, signed Magdelena Fehn, payable to cash and drawn on the Hamilton National Bank, Chattanooga, Tennessee. On the same day a cashier's check was issued by that bank payable to the Georgia Con-

ference of Seventh Day Adventists in the amount of $2000.00. The record is clear that the two checks represent the same fund which came originally from the account of Mrs. Magdelena Fehn, and that the bank was honoring her check at that time.

The next witness for the defendant was Campbell Carden, County Judge of Hamilton County, who was associated in the practice of law with Chancellor Curry prior to Chancellor Curry becoming Chancellor. He was offered by defendant for the purpose of showing the course of conduct of Mr. Schlickling in the deal which terminated in his execution of instruments whereby he conveyed the note which Mrs. Fehn had signed and was due him, and certain interest in lands to the defendant when the $10,000 check was turned over to Mr. Schlickling. He was asked many questions about correspondence he had with Mr. Arnold, attorney for the Georgia Conference in connection with the purchase of the note etc. by the Georgia Conference Seventh Day Adventists. The Court, during examination of this witness, as in practically every other witness, could not control solicitors or at least he did not do so. The substance of the testimony appearing in the record is that Judge Carden discussed the matter with Mr. Schlickling and that Mr. Schlickling requested the defendant, or its attorney through Judge Carden, to get his sister to make him a deed to the involved property in Chattanooga. The witness, while associated with Chancellor Curry, examined the title and so forth of the Tennessee property and assisted in preparing the deed to the Tennessee property involved in this proceeding. The purport of this testimony was to show that at the time of Mr. Schlickling's conversation with Judge Carden relative to procuring

title to the property in Chattanooga in 1954 and '55, he did not regard his sister as incompetent.

Time and time again through the taking of this testimony of this witness the Court admonished counsel for both parties to avoid constant interruptions, saying: "Let me get you gentlemen to proceed in an orderly fashion", and further that he would like to have them ask questions in the proper way so the jury might understand the relevancy of the testimony. Counsel evidently recognized the influence on the jury of statements made by counsel, as well as witnesses, that were improper and on one occasion in the presence of the jury counsel in the case said:

"* * * MR. MOON: What good does it do to say, 'Ladies and gentlemen, disregard the last so and so that came in?' It's too late then, the damage is done. * * *"

The writer of this Opinion wants to say at this point that unquestionably the jury could not analyze properly the evidence being adduced and presented in such fashion as appears in this record.

This witness' testimony clearly indicates that Mr. Schlickling was agreeable to making some sort of deal with the defendant in this case whereby title would pass to him through some conveyances by his sister and the Conference to certain of the involved property as late as 1954 and '55.

Just a few of the questions and answers are these:

"Q—He wanted the church to talk to her?

"A—He could not himself satisfactorily talk to her and he wanted the other people, the church people, to negotiate with her.

"Q—All right. Subsequently, Judge Carden, did you deliver this $10,000.00 check to Mr. Schlickling?

"A—Yes, I did. Along, I believe I received along with it or had already received from you the various deeds and quit-claim deeds and other releases that had to be executed by him and by his wife in connection with the transaction."

At that point remarked the Court:

"THE COURT: That phase of the case has been admitted in the pleadings, the delivery of the deeds and the acceptance of the $10,000.00 has been admitted by the pleadings."

This witness was asked and answered:

"Q—What property, Judge Carden, did Mr. and Mrs. Schlickling's deeds cover?

"A—Again, to the best of my recollection, and of course, the deeds would show exactly the property covered, claims to some property on O'Neal Street in Chattanooga, I think some that Mrs. Fehn had already handled in a transaction with the church, and another piece of property that Mr. Schlickling threw in, which was on O'Neal Street, and if I am not mistaken it also covered any claim he may have against Georgia property, some Georgia property that is in Fort Oglethorpe area which had been involved in a transaction between Mrs. Fehn and the church. That is to the best of my recollection."

He explained the instruments that were executed at the time the note signed by Mrs. Fehn payable to Schlickling was transferred to defendant and the $10,000.00 check delivered to Schlickling. This witness stated that he took the acknowledgment of Mr. and Mrs. Schlickling to the quit-claim deed which Schlickling had executed to defendant to the little strip of land on O'Neal Street in Chattanooga, which contained garages and driveways.

In connection with questions asked this witness the Court instructed the jury to disregard any conversation that amounted to merely a compromise. It is very clear in this record that if Mr. Schlickling acquired the property in Georgia that had been deeded to the defendant subject to the life estate of Mrs. Fehn, that the defendant and Mrs. Fehn both would have had to sign the deeds.

The next witness for defendant was Mr. Ross Arnold, defendant's solicitor. He testified that he prepared the deeds now involved, came over to Chattanooga and discussed them with Judge Carden, who was then practicing law, some parts of which were changed to comply with Tennessee law, and that he was the lawyer who was with Mr. Kungel and others at the time these deeds were signed and acknowledged by her and that he saw the $30.00 represented by the $10.00 cash recited in each deed, handed to Mrs. Fehn by Mr. Kungel. He said Mr. Schlickling executed the assignment on the promissory note involving the $10,000 payment to him and he explained that the mortgage and the note were still in full force and effect and there had been no effort to foreclose it, and that none of the debt had been paid; that it

had long been delinquent and that the Conference could have foreclosed it had it wanted to have done it.

Mr. E. E. Kungel was introduced by defendant, who stated he was a minister in the defendant church and had lived in Dalton, Georgia where he was stationed from 1950 to 1954; that his parents were native Germans who spoke German in their home and that he spoke both German and English, and had known Mrs. Fehn since sometime in '51. He had been in her home three or four times in 1952, '53 and '54. His first visit was just a visit with another minister of the church and they sat there in the house and talked with her from 30 to 45 minutes. She related to him her experiences in coming to this country and that her conversations were intelligent. Her home was a "typical old-fashioned German home like my folks would have." It was clean and she was dressed neatly as an elderly lady would be. He was there at the time these deeds were signed with Elder Nash, Rideout and Arnold and Mr. Hinds. He told about his conversation with Mrs. Fehn, how he had it written down, preserved the substance of it and that before these deeds were executed she had told him that she wanted to give her property to the church; had told him about the trouble with her brother and that Exhibit 8 was written out by Mrs. Fehn in her own handwriting. He identified the papers as heretofore stated. He filed the two page Exhibit written by her and his translation in English of the conversation he had with her and translated to English the document she wrote, Exhibit 8. He said there was no pressure of any kind asserted in connection with the translation and that from her conversation, his observation of her she

knew what she wanted to do and what she was doing. His statement is this:

"My opinion was that she knew what she was doing. She talked freely. She told me her desires and I wrote it down in longhand and I remember very distinctly what she said about her wishes".

And in answer to a proper question he stated that she was "Competent."

On cross examination this witness said that he arrived at the home of Mrs. Fehn about an hour before the others on the day the deeds were executed and that he talked to her in German telling her that the men who would be with him didn't understand the German language and he was the only one that could, and "I told her she should write out her experience when she came to the country and different things so that I could have it in writing." He came from Columbus and the others came from the Atlanta area. He stated that in the conversation she told him a good many things that were not written by her and that he made his memorandum translation thereof which is hereinbefore referred to as filed from the whole conversation. His attention was called to some discrepancies which he readily admitted and satisfactorily explained in the statement of conversation which he himself had written out.

This witness further stated that Mrs. Fehn said she would be getting the rent and she was going to have the houses painted. He stated that Mrs. Fehn needed no help at that time but that he made it clear if and when she needed any help, "the church would be glad to help her in any way possible."

On redirect he stated the notes which he took during the conversation with Mrs. Fehn were in German which he translated into English and typed it himself; that he was not an expert typist. He was asked during re-cross examination if there was any rush about the situation there and he explained there was not, saying:

"We visited, she showed me around the house, showed me her kitchen, gave me a glass of butter-milk and I talked to her about her cuckoo clock."

In answer to a question as to what he said to her relative to the cuckoo clock was that "I like those clocks and I would like to have one like that some day." The witness said he later had bought one. He saw Mrs. Fehn one time after that in 1954.

After the testimony of Mr. Kungel and in the absence of the jury a motion was made to withdraw the case from the jury, which was overruled and then a motion was made by defendant to strike the statement admitted and filed into the record prepared by Dr. Binger on the grounds it is hearsay in violation of the hearsay rule. Authorities were submitted and in response the Court said:

"THE COURT: The Court will properly charge the jury with regard to that document or letter, whatever it might be. Let the jury return."

Irene Clark, a witness called in rebuttal by the complainant, undertook to qualify as a witness relative to the mental condition of Mrs. Fehn. This woman had furnished some meals for Mrs. Fehn at $1.75 per day, which was paid by Mr. Rideout, he having said to her that Mrs. Fehn would have sufficient money to take care

of it. She then testified that Mrs. Fehn didn't have sufficient money; she called her brother and he paid some of the bills. This occurred in 1958.

The remainder of this lady's testimony so contradicts the facts of Mr. Schlickling's visits and attention to his sister, as admitted by him, in her effort to show incompetency and imbecility of Mrs. Fehn, that her testimony is wholly unreasonable and has no probative value whatever on the issues.

Complainant introduced a gentleman named Colonel Gleason, who explained foreclosure procedure under the Georgia laws which this Court sees no bearing on the issues whatever, but the witness did say that he had known Mr. Schlickling; that he had known Mrs. Fehn some 20 years; had known her husband, Joe Fehn, and he had transacted some business for them during the time they lived together. He knew Mrs. Fehn while she lived down in Georgia at Oglethorpe and that he had seen Mr. Schlickling down there on occasions, but could not state what years he had seen him, but said:

"* * * My impression is now that it was probably at intervals of some considerable distance apart whenever I would happen to be out there."

But he admitted this was prior to 1946 and he later saw her in 1953 or '54 when she came to his office in Georgia, but his statement relative to that was:

"My present impression is that Mrs. Fehn, Magdalena Fehn, came into my office sometime in 1953 or 1954 completely lost."

On objection, the Court sustained same, saying:

"THE COURT: Sustain the objection and strike the part of the answer from the record."

The argument between counsel and Court then was renewed vigorously as it had been all through the trial when Mr. Halladay said to the Court:

"MR. HALLADAY: I object to Mr. Moon's tactics, your Honor. He knew he could try to bootleg that testimony into this lawsuit in defiance of the Court's ruling."

The Court then said:

"THE COURT: This witness, as an attorney, knows his answers are to be responsive to the questions and not volunteer information."

Much time and several exceptions were taken up with argument and discussion about this testimony of this witness and with the jury present. As stated before, such was done throughout the trial of this case.

Mr. Schlickling was called back to the stand on rebuttal, but the only thing he said that the Court held competent was amount of taxes on involved property in 1953 which he claimed he paid. He was then asked:

"Q—All right, sir. Now have you ever collected any rent off of her property and promised to pay the taxes and repairs and failed to do it?

"A—The money was always turned over to her, she gave me so much to keep the places in shape and fixed up."

Summarizing the above evidence in a very short manner, after reading every word of the entire record, the facts as we view them may be said to be as follows:

Mrs. Fehn executed deeds on September 1, 1953, conveying the real estate described therein to the defendant, reserving unto herself a life estate, which means that she would receive the proceeds from this real estate for her care and protection the remainder of her life. These deeds were executed September 1, 1953. It is evident from the record that these properties had a reasonable rental income, necessary for her support, and that prior thereto her brother had been collecting the rents, either personally or through some collecting agency. Thereafter until there was a change in 1959 the collecting agencies in Georgia and Tennessee continued to collect the rents and turn the funds over to Mrs. Fehn.

These deeds were made to the religious organization in which she had the utmost faith. She accepted the teachings, as she understood them, and that religious organization had a strong belief in a final judgment in accord with God's plan, as she understood it, and as they taught it, for the end of the ages or the destruction of the world, also referred to judgment day.

Twenty-four days later and on September 24, 1953, she executed a will to that same organization and by that will, whether good or bad, she undertook to devise all property which she had, if any, in Germany and the remainder of property elsewhere at her death.

She did not speak English fluently at all. She only spoke in her native tongue, German, and of course they who did not understand the proper translation of the German language into English, could not converse with her very freely. Therefore she stood aloof to some extent from her neighbors and friends, more particularly who were of a different faith.

Mrs. Fehn in 1953 was 78 years of age, she had no children. Her husband was dead. His children by a former wife had engaged her in litigation over the property he left her. Her only relatives in this country were her brother and his children. This brother, who was the logical person for such purpose, was called into her home by defendant's request at the time she was about to execute the deeds and there in the presence of those who had known about her intentions for more than a year, he undertook to persuade her not to do what she purposed she would do. She was a determined person and she so advised her brother that it was her purpose and intention and that she was going to convey her property to the defendant. Apparently infuriated and disappointed, he left the group, left his sister and had no further communication with her by visit, telephone, personal or otherwise from that day on or about September 1, 1953 until in the latter part of 1958 or early part of 1959.

During that time she lived alone. At the time she made these conveyances to her church organization there was outstanding, for some consideration not revealed by this record, a note payable to her brother in the amount of approximately $5,500.00 secured by what is called a deed of security on the property located in Georgia which was conveyed by the aforesaid Conference.

This brother of hers contacted the defendant and arranged with the defendant to transfer it to the note he held, so executed by his sister and the security therefor, and during that process with no suit pending, but in that negotiation he undertook to get the defendant, through counsel, to have the property located in Chatta-

nooga, Tennessee, which she had conveyed to it, conveyed to him, which of necessity would have required the execution of a deed by the defendant and Mrs. Fehn, but a complete arrangement was made whereby the defendant paid to him $10,000.00 in cash for the transfer of the note, assignment of the security, the execution of his deed conveying to defendant an additional small portion of real estate located in Chattanooga, Tennessee, and apparently he and the defendant understood that a complete agreement had been reached with him with respect to all the property involved, even in this lawsuit. At that time Mrs. Fehn had accumulated from income of her property, over and above her living, since 1953 a bit more than $2,000 and sometime near this settlement, had with her brother and the defendant, she arranged transfer, shown by the exhibits, of $2,000 of her cash by check honored by her bank, to the defendant, for which she was given credit in accord with the bookkeeping arrangement of defendant. In none of these negotiations with Mr. Schlickling by the defendant does there appear any intimation upon his part or upon the part of any other person, the attorneys or others, any contention by Mr. Schlickling that Mrs. Fehn was incompetent and did not understand sufficient to execute a valid conveyance at the time the deeds were executed on September 1, 1953.

After that settlement was made with Mr. Schlickling and the transfers made by him to the defendant as aforesaid, he paid no further attention to his sister until 1959, when it is claimed that he found her in such condition that her estate could not be managed by her, and when he says she was not being cared for by the defendant and he proceeded to file a petition and have himself

appointed Conservator for her estate, and while he maintained that relationship to her,—that is conserving her estate, without qualifying as her guardian, he permitted her to continue to live in the home until she fell and broke her leg. His action and his evidence convinces us that it was not the desire to care for his sister that brought the conservator suit, for immediately he began to make an effort to set aside the conveyances that he had been informed were to be made prior to their making, had discussed it with his sister, had known about it in all of his transactions with defendant relating to the note he held, and had taken no steps whatever to obtain relief for her until in fact her mind was weakened by disease and by her age at that time of approximately 86 years.

The Guardian ad Litem appointed by the Court, while having been convinced that defendant had not cared for her, concluded that Mr. Schlickling, her brother, had an ulterior motive in his activity, not prompted by desire to be of service to his sister, but by a desire to get her property, filed his petition with the Chancellor alleging that Mr. Schlickling's hands were unclean and he was not entitled to have a Court of equity take care of Mrs. Fehn's financial matters for his ultimate benefit.

The case, as before stated, was tried to jurors who answered the issues submitted against the defendant. We have hereinbefore set forth the facts relating to the departure from Germany and the residence of both Mr. Schlickling and his sister, at different times and the occurrences, financially, between them after he arrived and before she arrived as well as after she came to this country. His attitude toward her during that period is not admirable when examined in its proper light.

 The questions posed by the Assignments, and in the order in which we propose to answer them, are as follows:

NO. I: DID THE COURT COMMIT AFFIRMA-
TIVE ERROR BY PERMITTING THE INTRODUC-
TION FOR THE CONSIDERATION OF THE JURY
THE STATEMENT OF DR. BINGER PREPARED
BY HIM, COPIED ON PAGE 25 OF THIS OPINION?

We conclude that he did. This statement of Dr. Binger made two and one-half years before these deeds were executed had never been filed in any lawsuit. It reposed in the files of an attorney who had represented Mrs. Fehn. He explained the purpose for which he had obtained it, and in view of the fact that she could not speak English no criticism to Chancellor Curry for having obtained the certificate, but he never used it for any purpose except to satisfy himself, so far as this record is concerned. He did not know that Dr. Binger signed it. It was mailed to him, he did not know Dr. Binger's signature. The Court permitted the signature to be proven by a banker who said he was not a handwriting expert who did not know Dr. Binger's signature, who only identified it as such by virtue of comparing it with the signature not known by him to be Dr. Binger's, but merely assumed to be. Dr. Binger's professional qualifications were permitted to be proven by his associate. Dr. Binger died in 1952. The admission of this statement of Dr. Binger is the only evidence by any physician or expert with respect to the mental capacity of Mrs. Fehn at any time prior to or since 1951.

The theory of the inadmissibility of such evidence is that no opportunity for cross examination is afforded.

This theory is fully explained by Mr. Wigmore, Vol. 5, 3rd Ed. Sections 1360-1684 in the text "Witness Unavailable" wherein it is said:

"Sec. 1403: Specific Cases of Unavailability; (1) Death. The death of the witness has always been the typical and acknowledged case of unavailability, and is equally conceded to suffice for depositions and for former testimony. * * *"

It must be observed, however, that this "Witness Unavailable Rule" because of death, has reference to statements or documents that have been admitted as evidence by the Courts in some legal proceedings. Such is not the case of Dr. Binger's alleged certificate.

In 20 Am. Jur. Evidence, Section 458 it is said:

"Hearsay evidence, as previously defined, is evidence which derives its value not solely from the credit to be given to the witness upon the stand, but in part from the veracity and competency of some other person. The clearest case of hearsay is where a witness testifies to the declarations of another for the purpose of proving the facts asserted by the declarant."

In the case of Tevis v. Proctor & Gamble Distributing Company, 21 Tenn. App. 494, 113 S. W. (2d) 64, 70, in an Opinion of the Eastern Section of this Court where there was one physician testifying to what another physician said with respect to his diagnosis of the plaintiff and where he sought to testify from a written report made by another physician who was not available, in that case the Trial Judge excluded the evidence and his action was assigned as error, saying:

"The trial judge excluded the evidence above, and his action in so doing is assigned as error. We think this assignment must also be overruled. In the first place, we think the probative value of the rejected testimony doubtful. But the testimony offered violates the rule prohibiting hearsay evidence from being introduced, and also the rule requiring the best evidence to be produced. The witness sought to testify to statements of Dr. Spurling, thus violating the rule against hearsay evidence, and he also sought to testify as to the *contents of a written report* made by Dr. Spurling, thus violating the rule requiring the production of the best evidence." (Emphasis added)

It is true that the Court said of that rejected evidence that it could not be seen where it could have aided the plaintiff's cause had it been admitted. The distinction in that case and the instant case with respect to the statement of Dr. Binger is that Dr. J. A. Stoechinger personally was testifying with respect to the condition, mentally and physically, of the plaintiff. In the instant case no physician was offered who had seen, treated or examined Mrs. Fehn.

In Riggs v. Mutual Life Insurance Company of New York, 26 Tenn. App. 397, 172 S. W. (2d) 1017, 1019 in an Opinion by Judge Ketchum of this Division of this Court, it was held that statements of the agent of the defendant to the effect that statements had been made to him by a doctor and others with respect to the condition of plaintiff were incompetent. Beach, the witness, an agent, had been permitted to testify to what these others, including the doctor had said. The Trial

Court in that case had admitted the evidence, and for an explanation of why he was admitting it, so that the Appellate Court would have full advantage of the reason, the Trial Court had written into that record the following:

"There is comparatively little real dispute, however, about the actual physical situation and condition of complainant, regardless of whether the testimony is excluded or admitted in evidence; and this court, therefore, had reached the conclusion that an equitable decision to the exceptions to the admission of testimony is to overrule all of same and consider as property (should be "properly") admissible all of the evidence offered by both sides. This policy will also facilitate the making up of the record in this cause in the event of an appeal."

In that case there was evidence by four or five doctors with a respect to the physical condition of the plaintiff. The Chancellor had dismissed the case. Error was assigned that the introduction of this evidence by the defendant was error. This Court said:

"The evidence of the witness Beach was clearly hearsay and inadmissible upon that ground. Exceptions were filed thereto in writing, pointing out the specific evidence complained of, and we think the Chancellor erred in admitting it over the objection of the complainant."

For this and other reasons recited in the Opinion, the decree of the Chancellor was reversed. It should be said that this was a case where there was no jury involved. It also should be said that other physicians,—

expert witnesses, testified as to the condition of the plain-tiff. Even under such circumstances the decree was reversed.

In the case of Banks v. Southern Potteries Inc., 30 Tenn. App. 199, 204 S. W. (2d) 382, 384 in an Opinion prepared by the Presiding Judge of this Court, McAmis, an Eastern Section case, there under consideration, the action of the Trial Court in refusing to admit in evidence a certificate by Vice Admiral McIntire based upon the medical report of Commander Greedy that the plaintiff was suffering from silicosis in the second stage and permanently disabled. The Court sustained the action of the Trial Judge, saying:

"To admit the certificate would give plaintiff the benefit of an opinion by one whose qualifications are not shown and, at the same time, effectually deprive defendant of the right of cross-examination."

The Court commented upon the fact that such was not admissible as a public record. In the instant case this certificate of Dr. Binger was nothing more than a private record of now Chancellor Curry, having never been introduced and made a part of a public record, such as might have made the certificate admissible.

We think there is further a statement made in that Opinion which applied properly in jury cases. Judge McAmis said:

"The jury chose between the conflicting testimony, both medical and lay, and we believe enough has been said to show that there is material evidence to sustain a finding that plaintiff was or was not suffering from silicosis."

In the instant case except for this incompetent certificate of Dr. Binger there is no medical witness whatever. Therefore, we say that apart from this medical certificate, which finally gets into the record by a comparison of an unproven genuine signature with the signature on the certificate by a non-expert, is bound to have affected the minds of the jurors in arriving at their verdict. Particularly is this true when there is not one line of proof in the record that this lady, Mrs. Fehn, who lived alone from the time she executed these deeds to 1959, practically six years, ever required the attendance of a single physician or doctor of any character.

It is said that the charge of the Court with respect to this certificate, as contended by complainant, puts it in the class of harmless error as provided by T. C. A. Section 27-117. His statement in his charge with respect to that certificate is as follows:

"In considering the weight to be given to the paper writing from Dr. Binger, which was transmitted to Magdalena Fehn's then attorney, you will keep in mind that it was written for the purpose of having Magdalena Fehn excused from testifying as a witness, and for no other purpose. You may consider whether or not it was used for that purpose. It is not a certificate that has been filed in any former legal proceeding and was not part of any court record. *In considering its probative value, if any,* you will keep in mind that Dr. Binger's letter does not have the effect of a deposition. It was not made under oath, and the defense had no opportunity to cross-examine the doctor. *It is not to be considered as a medical or clinical record of Campbell's Clinic or of Dr. Binger."* (Emphasis added)

We have italicized some of the above quote and if the learned Chancellor gave it no consideration as a medical or clinical record of either the Clinic or of Dr. Binger, how could it have any probative value for consideration by the jury? We think the jury of laymen, with no other medical evidence whatsoever to support plaintiff's contention of incapacity to understand the result of the execution of the deeds on the part of Mrs. Fehn could not disregard it and that it was incompetent and prejudicial to such an extent that the Judge of the Court, after he had permitted it to go in as a part of the proof, could not cure by such explanation in the charge. He should have refused to admit it, but after he did permit the jury to hear the evidence concerning it and to let the jury determine its probative value, he was doing nothing less than permitting the jury to determine its competency and probative value, all over objection of defendant.

We are constrained, therefore, to sustain Assignment of Error No. IV and in so doing that carries with it the necessity for sustaining Assignments of Error V and VI, for if the certificate is not competent then certainly it was incompetent to permit the proof of the signature of Dr. Binger to the certificate and his reputation as a physician, and especially in such way as it was permitted in this cause.

QUESTION NO. 2: IS THERE ANY COMPETENT, SUBSTANTIAL AND CONVINCING EVIDENCE TO SUPPORT THE VERDICT OF THE JURY?

On this question we recognize the rule in the Chancery Court, when the case is tried to a jury, is the same as if the case had been tried in a court of law.

The findings of the jury, approved by the Chancellor, are binding upon the Court of Appeals if there is any competent evidence to support them. T. C. A. Sec. 27-302; Bovay v. Bovay, (1943) 27 Tenn. App. 332, 181 S. W. (2d) 157; Hammond v. Herbert Hood Co., 31 Tenn. App. 683, 221 S. W. (2d) 98.

█ The right of a contestant to have the issue of mental capacity of a person who has executed a document valid on its face rests upon substantial or material evidence to determine the capacity of the individual to understand the result of his acts at the time of the execution of such document. More than a "scintilla" or "glimmer" of evidence is required. Hammond v. Union Planters National Bank, 189 Tenn. 93, 222 S. W. (2d) 377; Cude v. Culberson, 30 Tenn. App. 628, 629, 209 S. W. (2d) 506; Jones v. Sands, 41 Tenn. App. 1, 10, 292 S. W. (2d) 492.

█ The law does not require that a person in the execution of a deed, shall be able to dispose of his property with judgment and discretion, it is sufficient if they understand what they are about. Sizer's Pritchard on Wills, Sec. 99; Hammond v. Union Planters National Bank, supra; Cude v. Culberson, supra; Jones v. Sands, supra.

█ The rule is that there must be material, substantial and relevant evidence to show mental incapacity in the execution of a deed, will or contract, and in the absence of it there is no issue for the jury. Jones v. Sands, supra, and cases there cited, 41 Tenn. App. p. 11, 292 S. W. (2d) 492.

█ Material evidence is evidence that is material to the particular question in controversy upon the issues

joined, which must necessarily enter into the consideration of the controversy and by itself or in connection with other testimony be determinative to the case. Knoxville Traction Co. v. Brown, 115 Tenn. 323, 89 S. W. 319; Cude v. Culberson, supra, 30 Tenn. App. p. 638, 209 S. W. (2d) 506; Jones v. Sands, supra, 41 Tenn. App. p. 11, 292 S. W. (2d) 492.

 Substantial evidence means such pertinent or relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and evidence of incapacity by a lay witness must be based upon a predicate of reasonable and substantial facts. Cude v. Culberson, supra, 30 Tenn. App. p. 639, 209 S. W. (2d) 506, and cases there cited.

In Fitch v. American Trust Co., 4 Tenn. App. 87, 94, the Court said:

"The mere dogmatic assertion which does not appeal to the reason of the court, which does not have substantial and relevant consequence, which does not have fitness to induce conviction, is not proof even if uncontradicted, and does not interfere with the duty of the court to direct a verdict." Cude v. Culberson, 30 Tenn. App. 640, 209 S. W. (2d) 506.

 We are aware of the rule, and fully conscious of the result of the application of a rule to the effect "There can be no exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issue to be tried." Cude v. Culberson, supra, 30 Tenn. App. p. 638, 209 S. W. (2d) 511; Jones v. Sands, supra, 41 Tenn. App. p. 13, 292 S. W. (2d) 492.

All of the evidence in this case introduced for the purpose of tending to show the incapacity of Mrs. Fehn to execute the deeds in question on September 1, 1953, is to the effect that because she believed in the final destruction of the earth or of the world and in a final judgment day, she was not able to understand the consequence of her act in the execution of the deeds. To assume such a position would be contrary to the thought of individuals who are members of various groups of different related church organizations. Such belief is not confined to the Seventh Day Adventists though they may express it and impress it more fully than some others upon their associate believers.

The deeds themselves clearly show that she understood she was retaining a life estate. She expressed herself very sensibly and reasonably in her two page narrative written on the same occasion of the execution of the deeds. She continued to live on some of the properties conveyed until the very date this suit was instituted. There is no proof whatever in the record that the lady was afflicted with any disease which would make her mentally incapable to understand the result of her act. The insistence of her brother there at the time that she should not execute the deeds, is no proof of her incapacity. The circumstances surrounding that which occurred and when she executed the deeds, as well as that which immediately preceded the execution of the deeds, do not indicate or at least do not furnish inferences substantial in nature that she was incapacitated or unduly influenced.

The fact that the representatives of the grantees were offering their assistance in helping her with the execution of these deeds indicates no incapacity upon her part

to understand the results of her act. There is no need to go back into the very earliest cases for the substantiation of that statement, but in Seat v. McWhirter, 93 Tenn. 542, 29 S. W. 220 quoted and approved in the case of Clark v. Wilburn, 7 Tenn. App. 46, p. 58 in an Opinion by Judge Senter of this Court, it is said:

"The fact that grantees advised and encouraged the execution of the voluntary conveyance does not impair the validity of the instruments unless the fee agency of the grantor was destroyed."

There is nothing said in the instant case that indicates that Mrs. Fehn was anticipating a final judgment at any early date, when the deeds were executed. No witness said that any time was the date of the "Judgment Day" fixed by her. The fact that she was approximately 78 years of age, alone so to speak in the world, and in realization of the fact that she wanted to satisfy her desire to make a contribution to the church of her choice, furnishes no evidence of her insanity, but on the contrary furnishes evidence of the fact that she was of such age that she knew she should be about doing that which her conscience dictated.

We have quoted the evidence at some length in this Opinion, much more than seems to be needful, and we are unable to escape the conclusion that the Chancellor should have withdrawn the case from the jury and rendered a verdict in favor of the defendants, insofar as the validity of the execution of the deeds is concerned. Therefore, we are constrained to answer Question No. 2 in the negative and sustain Assignments of Error I, II, and III.

■ Assignment of Error No. IX to the effect that the Court erred in refusing to let defendant prove the details of the financial transaction with Mrs. Fehn on the grounds that such was gone into on cross examination and that it was the abuse of discretion not to permit defendant to explain it on redirect examination was largely a matter of discretion of the Court, and we are not in position to say that he abused his discretion in that regard, therefore, Assignment of Error No. IX is overruled.

■ QUESTION NO. 3: DID THE COURT ERR IN REFUSING TO PERMIT THE TESTIMONY OF JUDGE CAMPBELL CARDEN, OR THAT PART OF OF IT WHICH HE DID REFUSE TO PERMIT RELATING TO WHAT MR. SCHLICKLING WANTED HIM TO GET DEFENDANT TO DO WITH RESPECT TO DEEDING THE CHATTANOOGA PROPERTY TO HIM DURING THE NEGOTIATION WHICH TERMINATED IN THE ASSIGNMENT OF HIS DEBT, SECURITY AND DEED TO OTHER PROPERTY TO DEFENDANT?

Our answer to this question is "Yes," but in our opinion such action on the part of the Court is fully covered by the Harmless Error Statute.

■ QUESTION NO. 4: DID THE COURT ERR IN REFUSING TO CHARGE DEFENDANT'S SPECIAL REQUEST NO. 4, EMBRACED IN THE ASSIGNMENTS OF ERROR NO. XI?

Answer to that question is "No" because it stops short of a complete legal statement. Even if there should have been a charge with respect to the question raised by

Assignment of Error XI, in order to make it complete it would require the Court to have said:

"An opinion upon a matter of mere speculative belief in the realm of religion does not constitute insanity. Thus, belief in spiritualism does not in itself afford a test of insanity, but if such belief assumes such proportions as to amount to a mania, it may be treated as such."

A speculative religious belief could so affect an individual that it would amount to a mania and whether it has assumed such proportions is a question for the jury. Am. Jur. 29, Sec. 7, p. 144.

Now this record shows that the way and manner the defendant kept the account of Mrs. Fehn on its books, after she had sent to it the $2,000 check clearly indicates that such amount was being held to her credit and there appears to be a stipulation with respect to such an amount, which may become necessary for the support of Mrs. Fehn and the cause should be remanded to the Chancery Court of Hamilton County for the purposes of entering such decree as may provide for the application of such fund, together with interest thereon should the Court determine that interest thereon should be allowed to apply to the expense of proper support for Mrs. Fehn, if need be, and for such decrees as the Court may think proper with respect to the maintenance of the involved property.

So far as the decree of the Chancellor is in conflict with the Opinion of this Court and its decree thereon, the verdict of the jury and the decree of the Chancellor thereon is reversed.

It is evident from this record that counsel were in combat almost from the time the case opened for trial until it closed, much of which was permitted in the presence of the jurors and we are inclined to the opinion that such action on the part of counsel is an improper way to present issues in a court of equity to a jury.

Acting upon the authority vested in us by statute, all the costs of this appeal, including the cost of compiling the transcript of the record from the lower Court, will be paid one-third by the complainant, one-third by defendant and one-third by Albert Schlickling in his individual capacity, and all of the remaining costs in the lower Court will be taxed by that Court in the final decree of the Chancellor.

Carney and Bejach, JJ., concur.